**Melvin ZERKLE and William B. Weinberger, Plaintiffs,**

**v.**

**CLEVELAND–CLIFFS IRON COMPANY et al., Defendants.**

**No. 70 Civ. 2507.**

United States District Court,
S. D. New York.
March 25, 1971.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff Zerkle; Philip Jones and Howard Jacobs, New York City, of counsel.

Weinstein & Levinson, New York City, for plaintiff Weinberger; Frank Wein-

stein and Charles Trynin, New York City, of counsel.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for Cleveland-Cliffs Iron Co.; Morris B. Abram, Gerald D. Stern, New York City, and Leonard H. Becker, Washington, D. C., of counsel.

Lord, Day & Lord, New York City, for Cyclops Corp.; John Castles, III, and Michael Murphy, New York City, and Joseph Katarincic, Pittsburgh, Pa., of counsel.

Royall, Koegel & Wells, New York City, for Charles A. Carter, Robert L. Kaiser and William H. Coleman; Guy Quinlan, New York City, of counsel.

Seward & Kissel, New York City, for H. S. Harrison; Eugene P. Souther and Anthony R. Mansfield, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for Detroit Steel Corp.; Peter Gruenberger, New York City, of counsel.

Kass, Goodkind, Wechsler & Gerstein, New York City, for Objector; Stuart D. Wechsler, New York City, Lowell E. Sachnoff and Gerald L. Fishman, Chicago, Ill., of counsel.

POLLACK, District Judge.

The parties to two consolidated actions brought by stockholders on behalf of Detroit Steel Corporation derivatively and of a class of certain of its stockholders representatively, have submitted a proposed settlement embracing all claims and issues arising from the pleadings herein.

On February 27, 1971, following an evidentiary hearing, it appeared to the Court that a sufficient showing of fairness and propriety of the proposed adjustment had been made to warrant a hearing on notice to all stockholders of the corporation and members of the affected class to determine the fairness, reasonableness and adequacy of the settlement.

The Court accordingly directed transmission of an approved notice of a further hearing to be held on March 15, 1971 to the stockholders and such a hearing was had. The proponents of the settlement presented further proofs thereon in the form of documentary data and affidavits and submitted the record for the Court's consideration.

Three (or perhaps four) stockholders or former stockholders claiming interests in approximately 400 shares of the common stock of Detroit Steel appeared and were heard. Three of these holders appeared in person and voiced objections, largely directed to alleged losses which they have sustained either through market decline or sale of their respective stock investments in Detroit Steel without, however, asserting any particular fault with the proposed compromise.

One stockholder owning 100 shares, Acille Ciara, appeared by Chicago counsel and their New York associates. This stockholder is presently the plaintiff in a suit pending in the United States District Court for the Northern District of Illinois commenced in about December, 1970 where he asserts some of the same grievances as are asserted here. This objector questioned the settlement on the ground that the amounts involved in the complaints were disproportionately higher than the value of the consideration being proposed for settlement. Basically, this objector relies on the undocumented and conclusory contention that the valuation of the operating assets of Detroit Steel made by an investment banking firm and accepted by the directors and the plaintiffs in the pending actions as competent, fair and reasonable are so disparate from book value at which those assets were carried as to impair the basic assumption of fairness on which the settlement has been recommended to the Court.

The objector had no supporting proof but hoped to enlist the professional aid of a competent appraiser of the operat-

ing assets to demonstrate his point; he did not request an adjournment of the hearing but requested time to supply information bearing on the appraisal. Nor was any request made for an opportunity to question the appraisers or cross-examine them on their report and evaluation. The Court nonetheless adjourned the hearing until March 17, 1971 to enable the objector to produce a qualified person who would be willing to serve and who could be questioned to determine whether there was some concrete indication that the objection had sufficient preliminary indication of merit to warrant holding up a settlement that the remainder of the stockholders of Detroit Steel seemingly found unobjectionable and which the stockholder plaintiffs in the litigation affirmatively have commended to the Court after thorough study and mature consideration.

On the adjourned date, the objector introduced an expert who posed the query whether there had been any consideration of tax carryforwards and carrybacks in evaluating the assets of Detroit Steel. This was the subject of a speech he had delivered in 1968 to Security Analysts in a discussion of mergers and acquisitions. He thought that taxes were possibly overlooked by the directors, the investment bankers and counsel for the plaintiffs in evaluating the assets and liabilities of Detroit Steel. No proof was offered by the objector. He requested more time to submit more papers which arrived on March 20, 1971 with the suggestion that plaintiffs' counsel make more inquiry—adversary inquiry.

To avoid any possibility of overlooking any suggestion that might seem constructive the Court reconvened the hearing and heard and received further proof.

The affidavit of objector's counsel of March 20, 1971 again asserted the supposed oversight of relevant tax considerations; and that the Loeb Rhoades evaluation omits any expressed analysis or mention of tax losses which could be carried back. The defendants met this point specifically by the testimony of the Loeb Rhoades representative in charge of the appraisal. He established that in reaching the judgment expressed, Loeb Rhoades specifically took into account the effect which the operating losses at Portsmouth may have had upon a prospective purchaser—that was the very heart of the question with which they were faced, he said. Seemingly, the objector had raised an elementary point which a sophisticated investment banker would hardly have overlooked in a determination of value such as here involved. The testimony was unimpeached by the cross-examination conducted on behalf of the objector.

On the morning of the resumed hearing, the objector submitted a new affidavit from his counsel to which was attached a letter from their investment advisor.

In this latest submission, the contention was put forth that the Portsmouth plant might be made into a far more efficient facility by spending, say, $65 a ton for new electric and direct reduction capacity rather than by spending the money projected as needed to rehabilitate the facilities. Attached to this contention of the advisor to the objector, was an article taken from the March, 1971 issue of Fortune Magazine entitled "Steel: Recasting an Industry Under Stress." The article mentions a new technology already in use; that is, the direct reduction of ore to iron in electric furnaces.

The objector's point was that the capital expenditures estimated to make Portsmouth a competitive, efficient, steelmaking facility, may be considerably more favorable than is suggested in the appraisal "which pointedly omits any references to the new steelmaking technology," he says. However, the magazine article relied on warns that "like most revolutions it carries high risks as well as great promise".

The defendants produced at the hearing an outstanding expert in steel economics, a professor at a leading University. This expert riddled the notions of the objector with cogent testimony that beyond cavil established the non-feasibility of the contention put forth (really only a hypothesis based on outright speculations) and convincingly established that the road ahead for the peculiar problems at Portsmouth lie in the direction in which the management has planned: the capital expenditures program for relining the blast furnace, equipment for dealing with the problems of water and air pollution, and a variety of other items. It developed that the magazine writer had in fact consulted with defendants' expert on some of the technical aspects of his paper and had no substantial background of actual underlying experience; that the article was a good paper, but its application to actual situations necessarily had to be governed by the facts and circumstances involved.

According to the objector, there has been no fraud or misrepresentation nor is there any suggestion here of overreaching and

> there is no question of the integrity and sincerity of counsel or the ability and reputation of the investment bankers. (Sachnoff Aff. 3/20/71, p. 9).

The Court's inquiries addressed to objector's counsel also elicited the following:

> THE COURT: Have you any evidence whatsoever that the plaintiffs' lawyers in this case did not negotiate in good faith at arm's length?
>
> MR. SACHNOFF: Absolutely none, your Honor. (R. 24 of 3/17/71).

The further facts underlying the proposed settlement and compromise are as follows:

## I.

Cliffs-St. Clair Corporation (formerly known as Detroit Steel Corporation and hereinafter referred to as "Detroit Steel" for convenience) was a steel producer whose shares of outstanding stocks were listed on the New York Stock Exchange until December 11, 1970 when they were delisted. It had 3,202,469 shares of common stock outstanding at that time.

Detroit Steel was the owner of 29% of the stock of the Cleveland Cliffs Iron Company (Cliffs hereafter) which is engaged in mining and transportation of iron ore and other activities; its shares are listed on the New York Stock Exchange.

Cyclops Corporation, a stainless steel producer whose shares are also listed on the New York Stock Exchange, owned 19.3% of the stock of Detroit Steel. These Detroit shares had been purchased by Cyclops from American Export Industries, Inc. on March 24, 1970 for about $24 a share.

Detroit Steel had operating facilities consisting principally of an integrated steel plant located near Portsmouth, Ohio. The evidence indicates that these facilities were obsolescent and indeed obsolete in certain respects. Reconditioning thereof together with needed additions of anti-pollution remedies are essential to profitable operation and would cost in the neighborhood of $42.9-million according to the evidence submitted. The components of that estimate are set out in the record in detail and are vouched for by an informed expert as well as by the deposition of a knowledgeable officer of Cyclops.

In addition, Detroit faces other expenses and obligations. As of March 1, 1970, the actuarily computed value of vested benefits under the retirement plans of Detroit Steel for eligible employees exceeded pension funds and balance sheet accruals by about $24,500,-000. To add to its dismal financial picture, Detroit has a $28-million debt obligation to an insurance company lender drawing interest at 5½% and payable in annual installments of $1,-

900,000 from July, 1971. Its current liabilities amount to $21,980,000.

In evaluating the proposed transfer to Cyclops of Detroit Steel's operating assets and liabilities, the investment banking firm of Loeb, Rhoades & Company of New York City concluded that:

> the broadest range of value of the assets and liabilities to be transferred to Cyclops appears to be, "from 1.4 million dollars to a negative 17.6 million dollars".

The financial reports concerning Detroit Steel support this opinion. According to Cyclops, the Portsmouth Plant incurred $5,700,000 in operating losses in 1969 and in excess of that sum in 1970. Detroit Steel's 1969 earnings came to 6 cents per share as compared with 85 cents per share in 1968 and 93 cents per share in 1967, all including dividends received. Absent dividend income, Detroit Steel would have reported a loss of 37 cents per share in 1969 as compared to profits of 44 cents in 1968 and 57 cents in 1967. Total losses for the ten month twelve day period ended November 12, 1970, came to 76 cents before dividends received, and even including dividends, 61 cents. Detroit Steel omitted dividends in the third and fourth quarters of 1969 and in 1970.

The general and associate counsel for the plaintiffs gave consideration to the Loeb Rhoades report as well as the insurance company appraisals of the value of Detroit Steel's operating assets in making their recommendation of the settlement.

The Court does not perceive in the record any basis on which to question the honesty and good faith of the appraisal. Objector's counsel conceded that there was room for an honest difference of opinion and he conceded on the initial hearing that a further examination of the assets might sustain the valuations reached. The report and valuation made by the investment bankers stands unimpugned and unimpeached.

## II. *The May 28, 1970 Transaction*

On May 28, 1970, Cliffs and Cyclops agreed that Cliffs would initiate a tender offer, at a price of $16.50 per share for all outstanding shares of Detroit Steel common stock other than those held by Cyclops, and that upon the successful completion of the tender offer, they would use their best efforts to cause Detroit Steel to exchange its operating assets, subject to substantially all liabilities, for the block of Detroit Steel's stock held by Cyclops.

On November 12, 1970, Detroit Steel transferred its operating assets to Cyclops, together with a $1,414,000 promissory note, in exchange for the Detroit Steel common stock owned by Cyclops. As a result of the tender offer and subsequent transactions, Cliffs thus acquired about 82.3% of the total outstanding voting common stock of Detroit Steel.

Detroit Steel's principal remaining asset in consequences of the foregoing transactions and events is its block of Cliffs stock. Cyclops indirectly owns and operates Detroit Steel's operating facilities subject to substantially all of its liabilities.

## III. *The Law Suit Complaints*

Plaintiffs' complaint is brought (a) derivatively on behalf of Detroit Steel, charging that the transfer of the Detroit Steel operating assets was for inadequate consideration in breach of fiduciary duties, federal, common and state statutory law, including §§ 10(b), 13(e), 14(e), 14(f) and 16(b) of the Securities Exchange Act of 1934, as amended, and was a fraud upon the Detroit Steel shareholders; and (b) representatively on behalf of a class of certain Detroit Steel shareholders, charging the disproportionate distribution of assets of Detroit Steel. Defendants deny all charges and disclaim any liability.

The alleged violation of Section 16 (b) charged is that Cyclops' acquisition

of the block of Detroit Steel stock held by American Export Industries, Inc. and its subsequent exchange of that block for Detroit Steel's operating assets resulted in a short-swing profit to Cyclops in violation of Section 16(b) of the Exchange Act.

The class action count included in the complaint is brought on behalf of the shareholders of Detroit Steel (other than Cliffs and Cyclops) who were shareholders as of August 20, 1970, or as of "such date as [Detroit Steel] became obliged to distribute its [operating] assets to Cyclops in exchange for shares of [Detroit Steel's] common stock" held by Cyclops. In essence, the class-action count charges that Detroit Steel made a disproportionate distribution of the assets of Detroit Steel—that Cyclops received assets worth more per share in its exchange of Detroit Steel stock for Detroit Steel's operating assets than was left in Detroit Steel to underlie the value of the shares held by the remaining Detroit Steel stockholders.

The defendants submit that the value of the Detroit Steel stock given by Cyclops in exchange for the Detroit Steel operating assets was not inadequate consideration therefor, and that the block of Cliffs stock held by Detroit Steel offers no possibility of control of Cliffs and so is entitled to no premium price above the market value of its shares.

In addition, Cyclops disputes its liability under Section 16(b) of the Exchange Act on the ground that no purchase and sale of Detroit Steel securities occurred within the six month period required by the statute. Cyclops contends that consummation of the transaction between it and Detroit Steel could only be effectively agreed on by the insurance company lenders of Detroit Steel who are not subject to the control of Cyclops, Cliffs, or Detroit Steel; that the lenders did not agree to any transaction in respect of the assets until after expiration of the six month period following Cyclops' purchase of Detroit Steel's stock; and that the exchange of stock for Detroit Steel's operating assets did not take place until more than seven months after Cyclops acquired the Detroit Steel stock.

As general counsel for plaintiffs recognized in response to the inquiry of the Court, plaintiffs' case turns on the question of the worth of Detroit Steel's operating assets and no matter how variously phrased, *all* the counts set forth in the complaint, including the § 16(b) claim, under the federal securities laws and state statutory and common law hinge on whether or not there was a fair valuation of the plant in the transfer of the assets.

Cyclops bought a current balance sheet in which the Detroit Steel operating assets and the liabilities assumed by Cyclops were considered on the basis of current worth. Tax considerations were included. During the period prior to the tender offer, the stock of Detroit was selling at a price below the underlying Cliffs shares owned by Detroit Steel. This was indicative that the market was placing a negative value on the operating and other assets of Detroit Steel. It is into those assets, that the objector seeks to infuse value by a reappraisal including consideration of the supposedly overlooked tax recovery.

## IV. *Discovery*

The plaintiffs herein have had extensive pretrial discovery. General counsel has stated that he had:

"received the complete cooperation of the defendants in making available to us whatever witnesses we desired to examine and whatever records existed that related to the transactions involved in this case and before arriving at the settlement testimony was taken and a multitude of records and documents were examined, * * * and we were thus able to evaluate our

case and negotiate with full knowledge of the relevant factors."

General counsel has further stated that he had pursued the charges under §§ 10(b), 13(e) and 14(e) of the Exchange Act to the point where he believed them to be "dubious" claims— in other words, that in the light of the evidence he had developed he doubted the existence of substantial merit in those claims.

On the other hand, general counsel thought he could develop a valid claim of waste—specifically that Detroit Steel's assets had been sold to Cyclops for an inadequate consideration. And he expressed the view that he had developed a case against Cyclops under § 16(b). But with respect to even those claims, he conceded that inquiry would necessarily be directed to determining the value of Detroit Steel's operating assets.

In this context, general counsel stated his belief that he had a better action for common law waste than for a § 16(b) recovery. To establish a case of waste, plaintiffs would have to show that the Detroit Steel operating assets were worth more per share than approximately $14—the market price of Detroit Steel stock at the time of the transfer of Detroit Steel's operating assets to Cyclops. However, to establish a case under § 16(b), he would have to show that those operating facilities were worth more than $24 per share— the price Cyclops paid to American Export Industries, Inc. for its block of Detroit Steel's stock. The valuation of the assets precludes any rational belief that such a showing could be made.

Defendants also challenge plaintiff's contention that the block of Cliffs stock sold by Detroit Steel represents a potential controlling interest in Cliffs. It appears sufficiently from the facts before the Court that the block of Cliffs stock held by Detroit Steel should not be, and historically has not been, entitled to any premium in excess of the ag-gregate market value of the component shares as reflected in trading on the New York Stock Exchange. The affidavit of the Cliffs vice president in charge of planning and corporate development indicates an experience since 1962 with Cliffs. It was on the basis of his experience with a knowledge of the company that this officer averred that the block of Cliffs stock held by Detroit Steel does not now, and has not in the past, enabled Detroit Steel to exercise control over Cliffs.

The objector's prime reliance is on his conclusion that there has been lack of adequate discovery, particularly on the crucial valuation question. The facts do not support such conclusion and if there is a fair settlement, it should not be held up by unsubstantiated speculations. Although the dissident Chicago stockholder has had since at least August, 1970 an awareness of and opportunity to raise and investigate the questions now thrust at the offer in compromise, he has done nothing to inform himself of the merits or even to ask questions until now and his present suggestion of possible lack of adversarial scrutiny seems unjustified and adventitious.

Reference was made on the hearing by objector's counsel to the "phantom question of tax advantage." (Sachnoff, p. 51 of 3/17/71). Whether intended or a slip, the matter was aptly put in that style.

## V.   *The Offer in Settlement*

The proposed settlement embraces all claims asserted in and issues raised by the complaint. The proposal is to settle all claims that could have been asserted with respect to the matters or transactions alleged or referred to in the action, and the claim that has been framed as a class claim for any damages sustained by the Detroit Steel shareholders as of August 13, through 31, 1970, due to the transfer of Detroit

Steel's operating facilities for an allegedly inadequate consideration.

The Agreement provides benefits for Detroit Steel shareholders of record (other than Cliffs and Cyclops) on any date during the period from August 13, 1970 to August 31, 1970 and from February 19, 1971 to February 26, 1971. The Agreement excludes from the class the dissenting shareholders of Detroit Steel who have pursued their appraisal rights under Michigan law, unless they forego these rights. It also excludes any former Detroit Steel shareholder who tendered his stock pursuant to the Cliffs tender offer of May, 1970.

The Agreement extends to the Detroit Steel shareholders during the February period the right to exchange each share of Detroit Steel held during the period for (1) $^{34}/_{100}$ of one Cliffs common share, that being the approximate proportion of Cliff stock now owned by Detroit Steel that each Detroit Steel shareholder would be entitled to receive upon a distribution of Detroit Steel's assets, and (2) an option certificate, transferable in form and having a life of at least 7 months, to purchase a fraction of one Cliffs share at $66 per Cliffs share, the fraction to be determined on the basis of a "sliding scale" by which the amount of Cliffs stock subject to the option will increase if the average price of the stock (as determined by a formula) should decline by the time of the offering.

The Detroit Steel shareholders of record during the August period who did not hold shares of record in the February period will be entitled to receive only the option certificate, pursuant to the terms and conditions described above.

Any Detroit Steel shareholders of record during the February period who sell their stock before it can be exchanged, and who therefore are ineligible to participate in the exchange of Detroit Steel shares for Cliffs shares, will be entitled nonetheless to the option certificates with respect to their ownership during the February period.

As part of the settlement, Detroit Steel will deliver a release to all of the defendants in exchange for a payment of $50,000 to Detroit Steel by Cyclops which will relate to the § 16(b) claims; and in exchange for other consideration, the release of all other claims alleged in the action on behalf of Detroit Steel.

Cliffs and Cyclops have agreed to pay the fees and disbursements of plaintiffs' counsel in such amount as shall be determined by the Court upon appropriate application therefor.

### VI. *Value of the Benefits*

The estimated value of the benefits to the stockholders of Detroit Steel varies from approximately $3,500,000 to $4,124,000. The computation underlying these amounts is made as follows.

The market value of Detroit Steel stock on the over-the-counter market during the week preceding the February 27, 1971 hearing was approximately $18–$19 per share.

The Detroit Steel stockholder will be offered an exchange of his share of stock for $^{34}/_{100}$ share of Cliffs stock (Market Value $66) and a warrant exercisable during seven months giving the holder the option to acquire .20 of a share of Cliffs at $66 per share. This percent increases to .30 if the market value of the stock goes down. Expert proof has valued this option at about $8.10 per share of Cliffs.

These figures on a per share basis of Detroit Steel stock yield estimated benefits of $3.40 (up to $4.40) on the exchange of stock plus $1.60 (up to $1.80) on the option, to the owner of Detroit Steel stock. In the February period, 624,500 shares of Detroit Steel, approximately, were outstanding, other than shares held by Cliffs. The number of shares of Detroit Steel stock with respect to which option certificates may be issued, is approximately 800,000 shares.

Applying the estimated benefits per share to the number of shares respectively to be considered, results in values through the settlement of $3.5-million to $4.1-million to Detroit Steel shareholders to be received by them in addition to the liquidating value of their shares estimated at the market price prevailing during the last week of February, 1971.

To achieve such a benefit for the public stockholders by litigation of the claims in suit, the recovery would have to amount to from $17.5-million to $20-million since just over 80% of the stock is owned by Cliffs. The possibility of such a recovery has led the general counsel for plaintiff to express the belief that "the settlement secures more than meets the test of adequacy, fairness and reasonableness". In expressing his satisfaction, associate counsel for the co-plaintiff characterized the settlement as "good" and arrived at following "arm's length negotiations over a considerable period".

### VII. *The Standards to be Applied*

■■■ Approval of a compromise of derivative and representative litigation is based on a balancing of likelihoods rather than an actual determination of the facts and applicable law. The ultimate test for the exercise of the discretion of the Court is the interest of the class or corporation. A compromise will be approved as "fair", "reasonable" and "adequate" if it serves that interest. The proponents of a compromise have the burden of proving its fairness. The Court is the guardian of the absent class members. It must therefore exercise judgment based on careful judicial scrutiny in passing on the fairness of the settlement. It has often been said that, "the bird in the hand is to be preferred to the flock in the bush and a poor settlement to a good litigation".

The Court will *not* substitute its business judgment for that of the parties; "the only question * * * is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval." Glicken v. Bradford, 35 F.R.D. 144, 151 (S.D.N.Y.1964) (Ryan, J.). See also, Winkelman v. General Motors Corp., 48 F.Supp. 490, 493, modified, 48 F.Supp. 500 (S.D.N.Y. 1942). In Schleiff v. Chesapeake & Ohio Ry. Co., 43 F.R.D. 175 (S.D.N.Y. 1967) (Wyatt, J.) the Court said:

> In determining whether to approve the compromise or not, the Court does not try out the disputed issues. The compromise was agreed to for the purpose of avoiding just that. 43 F.R.D. at 178.

■■■ The settlement in the instant case was the result of good faith bargaining. Stockholder litigation is notably difficult and unpredictable. In these circumstances, the Courts have displayed a healthy skepticism in the face of optimistic forecasts or large demands. In this case, a rational appraisal of the doubts and uncertainties which affect any prognosis of recovery are such as to make the solution which has been arrived at by the offer in compromise a desirable and fair disposition of the controversies. There are present in this case serious questions of law which stand in the way of a recovery for the plaintiffs and taken together with the difficulties of proof, the uncertainties of law and other foreseeable obstacles to success favor a compromise of the litigation.

The showing made by the objector falls fundamentally short of any bona fide indication whatsoever of genuine grounds of objection. Concededly, there was no fraud or misrepresentation; no one was misled. This is in sharp contrast to the case relied on by the objector. Percadoni v. Riker-Maxson Corp., CCH Fed.Sec.L.Rep. ¶ 92823 (S.D.N.Y.1970) (Croake, J.). The proponents of the settlement have carried their burden of satisfying the Court that the compromise proposed is fair, reasonable and adequate, negotiated at

**160**

arms length, with a proper awareness of and consideration given to the relevant factors to be weighed in arriving at an informed judgment and there was a proper acceptance thereof.

Accordingly, counsel for both sides are well advised in recommending the settlement and this Court approves it and directs its consummation. An appropriate judgment may be submitted in conformity with Rule 54(a) Fed.R. Civ.P. The judgment shall provide that upon the decree becoming final an allowance of fees and disbursements to counsel for the plaintiffs herein may be fixed and entered at the foot of the decree. The Court will retain jurisdiction for said purpose and for the enforcement and satisfaction of the decree.

The parties have called to the Court's attention paragraph 10 of the Settlement Agreement which provides:

Cleveland-Cliffs shall have the right to terminate this Agreement upon written notice to all other parties hereto:

(a) If prior to May 31, 1971, the judgment, order or decree provided for herein has not become final by the expiration of the time to appeal therefrom, or if an appeal has been taken from such judgment, order or decree, the appeal has not been disposed of in a manner wholly consistent herewith prior to such date; or

(b) If the Registration Statement shall not have become effective prior to May 31, 1971.

Consequently, the proponents of the settlement, properly mindful of the benefits thereof to be conserved, request that if an appeal is filed herein, it shall be given expedited treatment. However, this is a matter solely within the province of the Court of Appeals.

So ordered.