Kenneth RUBENSTEIN

v.

**REPUBLIC NATIONAL LIFE INSUR-ANCE COMPANY et al.**

Norman P. MILLER

v.

**REPUBLIC NATIONAL LIFE INSUR-ANCE COMPANY et al.**

Norman MILLER et al.

v.

**REPUBLIC NATIONAL LIFE INSUR-ANCE COMPANY et al.**

Norman MILLER

v.

**REPUBLIC NATIONAL LIFE INSUR-ANCE COMPANY et al.**

No. CA 3–76–0992–G.

United States District Court,
N. D. Texas, Dallas Division.

Aug. 20, 1976.

---

Stuart D. Wechsler and Robert S. Schachter, New York City, for proponent Norman Miller, et al.

Edward Labaton, New York City, for proponent Kenneth Rubenstein.

William C. Harvin, John C. Held and Darrel E. Reed, Jr., Houston, Tex., for defendant.

Harry A. Young, Jr., Chicago, Ill., for objector Sussman.

## ORAL OPINION AND DECISION

POLLACK, District Judge.

The Plaintiffs in four class suits brought by purchasers of the common stock of Republic National Life Insurance Company of Dallas, Texas (Republic hereafter), have submitted a proposed settlement embracing all claims by the class members against Republic and all other Defendants in these suits arising out of, based upon or related to the matters set forth in the constituent Complaints filed in these actions and in the amended Complaint.

On July 19, 1976, following a pre-trial hearing it appeared to the Court that a sufficient showing of fairness and propriety of the proposal had been made to warrant a hearing on notice to all members of the affected classes to determine the fairness, reasonableness and adequacy of the settlement as proposed.

The Court, accordingly, directed transmission to the ascertainable members of the classes of an approved notice of a settlement hearing to be held commencing on August 18th, 1976, in the United States Courthouse at Dallas, Texas, to which, as explained hereafter, the class claims had been transferred pursuant to 28 U.S.C. Section 1404(a). And on August 18th and 19th, 1976, such a hearing was held.

The Proponents of the settlement presented further proof thereon in the form of documentary data and affidavits and submitted the records for the Court's consideration. Some 13,000 notices of the hearing were sent to purchasers of stock in respect to purchases made during the period 1970 to '74 involved in these cases as defined and fixed by Court order. Additionally, copies of the Notice of Hearing were sent to a wide array of persons and firms in the public relations field and to their media, comprising newspapers, trade journals, financial press and others. The Notice of Hearing was sent to and filed with the Securities and Exchange Commission. It is estimated that upwards of 2,500,000 shares of the common stock of Republic were purchased during the relevant period and not sold which could be the basis of proofs of claim for the so-called general class, as that is defined in the stipulation of settlement; that some 700,000 shares of stock were acquired in the merger which gave rise to the so-called Pacific shareholder class; and that an undefined further number of shares were bought by purchasers who sold the same in the period between November, 1973, and February 7th, 1974.

Only two joint owners of 100 shares of the common stock of Republic appeared by Counsel at the hearings and submitted written and voiced oral objections to the settlement. These owners are presently the Plaintiffs in a suit pending in the United States District Court for the Southern District of New York commenced in 1974 shortly after the commencement of the

suits presently before this Court for consideration on settlement.

In that suit the joint owners assert some or perhaps all of the same grievances as are asserted here but certainly not any others.

These joint owners questioned the settlement proposed and the notice thereof but supplied no independent or supporting evidence to sustain their objections relying on argument and conclusions. There was no suggestion that the Plaintiff's Counsel failed to negotiate in good faith and at arm's length and no suggestion was made of any misrepresentation or overreaching which would taint the proposal of settlement.

On the basis of the record herein and of the Court's familiarity with the litigations and the extensive pre-trial proceedings conducted under the Court's supervision since inception of these cases, the Court finds that the proposed settlement as amended and restated on August 19th, 1976, which will be referred to hereafter solely as the "settlement", has been arrived at in good faith, represents the exercise of reasonable business judgment and is fair, reasonable and adequate and should be approved.

The settlement as amended and restated was negotiated in an adversary context and is free of any taint of self-interest personal to the Plaintiffs herein. The resolution of the controversies involved in the manner proposed will serve the best interest of the classes and of Republic.

In amplification of the foregoing, the background of these cases and the further findings of the Court are the following:

These suits have been processed through the Multi-district Panel under and pursuant to Title 28 of the United States Code, Section 1407. A number of representative and derivative suits pertaining to the same subject matter were filed in different districts of the United States Courts. In March of 1974 following a two-year investigation the Securities and Exchange Commission filed an enforcement action in the Southern District of New York against Republic, seven of its officials and its auditor, Peat, Mar-

wick, Mitchell & Co., Realty Equities Corporation of New York, two of its officials and its auditor, Westheimer, Fine, Berger & Company and two other individuals.

The Commission alleged that Defendants had violated the federal securities laws by participating in a scheme to defraud the investing public by concealing the fact that Realty, in which Republic had a huge investment, was in dire financial condition.

The Commission further alleged that as a result of this alleged scheme, Republic was able to perpetuate the materially false appearance that its holdings in Realty were valuable assets and was able to report as income millions of dollars in funds that Republic had pumped into Realty or Realty controlled companies for the specific purpose of enabling Realty in turn to pay interest on the debt it owed Republic.

Following shortly on the heels of and in the trail blazed by the SEC action, 17 private actions concerning the Republic-Realty financial relationship were filed in three different districts of the United States Courts: Twelve in the Southern District of New York, four in the Northern District of Texas and one in the Middle District of Tennessee. Taken as a whole, they involved the same charges and the same, as well as additional Defendants. Plaintiffs in many of the actions purported to represent similar classes of Republic or Realty securities holders.

The private suits fell into two categories; one, suits on behalf of the Plaintiffs and the class represented by the Plaintiffs. And two, derivative suits brought by stockholders on behalf of Republic and in its alleged interest for damages allegedly sustained by it.

The Multi-district Panel ruled that transfer of all actions should be made pursuant to Section 1407 of Title 28 of the United States Code to the Southern District of New York to best serve the just and efficient conduct of the pre-trial phases of the litigations. The undersigned was designated by the Multi-district Panel as the transferee judge to handle the pre-trial aspects of the cases and they were processed accordingly from their inception.

The first of the private class suits was filed in the Northern District of Texas. This was the situs of Republic, its records, its officers and directors and employees as well as the locale of the supervising agency of Republic, the Insurance Commission of the State of Texas. And the place where most of the 72 depositions conducted in the pre-trial proceedings herein were taken. And where the convenience of parties' counsel and witnesses would best be served in respect to a hearing on settlement of the class suit claims.

Accordingly, pursuant to Title 28 of the United States Code, Section 1404(a) the class claims were severed and transferred to the Northern District of Texas at Dallas and by request of the Multi-district Panel and the Inter-Circuit Assignment Committee of the United States Courts and upon Inter-Circuit Assignment by the Chief Justice of the United States the undersigned was designated to conduct the hearing in this district of the instant settlement proceedings.

The charges against Republic arise from its dealings and transactions with Realty Equities Corporation of New York, hereafter "Realty Equities", during the time periods September 1, 1970, to February 7, 1974, and can be set forth in the following categories:

A; Republic's statutory financial statements overstated the carrying value of certain of its assets in 1970, 1971 and 1972.

B; Republic's statutory financial statements incorrectly reported as income, monies received from Realty Equities or its subsidiaries as a direct result of: one, Republic's placing additional mortgage loans on properties owned or controlled by Realty Equities. Or, two: Republic's renewing existing mortgage loans for an increased amount sufficient to cover accrued principal and interest.

C; Republic's statutory financial statement for the years 1970, 1971 and 1972 failed to disclose Republic's concentration of investment in Realty Equities.

And D; Republic's financial statements for the years ending December 31, 1969, 1970, 1971 and 1972 were materially false and misleading because they allegedly failed to disclose and write down the problem real estate investments other than those involving Realty Equities and allegedly overstated gross life insurance in force and gross life insurance premium income.

The charges in these cases against the auditing firm of Peat, Marwick and Mitchell and Company arise out of its relationship to Republic as its independent auditing firm which issued unqualified opinions on the financial statements of Republic for the years ending 1970, 1971 and 1972. It is charged herein that Peat, Marwick participated in and aided and abetted Republic in respect to the matters which are outlined above.

The members of Republic's finance and investment committee are charged in these cases with making untrue statements in respect of the matters indicated previously and with aiding and abetting each other in connection with such misrepresentations and misstatements.

The outside directors of Republic are charged in these cases with making untrue statements in respect of the same matters described in the categories outlined above and with aiding and abetting each other in connection with such statements.

Realty Equities and its coterie of officers and directors are charged herein with making untrue statements in respect to the matters described above and aiding and abetting each other in connection with such statements.

Certain Defendants, namely, Karp, Evers and O'Toole are charged with making untrue statements with respect to appraisals on property in scattered portions of the country in late 1971.

One, Neal Stanley, an employee of Republic, is charged with having certified Republic's 1970 statutory financial statement which is alleged to contain misstatements in respect of the matters previously described.

In response to these charges, all of the answering Defendants denied the allega-

tions against them and the Defendant Republic asserted that the claims of all class members who purchased Republic shares before February 28, 1972 were barred by the statute of limitation applicable to the transactions in question.

Republic is a life insurance company organized under and pursuant to the insurance laws of the State of Texas and as such was required to use generally accepted insurance accounting principles, denominated sometimes as statutory accountings, in preparation of its financial statements until 1974. The phrase generally accepted insurance accounting principles may be taken to mean those principles which are either prescribed or permitted by the Commissioner of Insurance of the State of Texas. The reversal of income and restatement of prior years statutory financial statements which were finally made by Republic facially appears not to be in accordance with the statutory accounting practices but a departure therefrom and of treatment accorded under generally accepted accounting principles unrelated to the particular insurance field.

Statutory accounting practices permit Republic to recognize as income funds received as a direct result of the making of new mortgage loans on the property or the refunding, meaning the increasing of a mortgage loan on an existing property to cover a principal and interest payment provided that such new mortgage loan or such increase does not result in the public having a mortgage loan in excess of 75 percent of the appraised value of such property.

The claim of the general class of Plaintiff litigants herein which is comprised of those who made purchases of the common stock of Republic in the period 1970 to '74, against the Defendants on Republic's finance and investment committee turns directly on the question of valuation, the extent of the knowledge of each Defendant of an overvaluation, the failure of the financial statements to disclose the extent of dealings and involvements between Republic and Realty Equities, the overstatement of gross life insurance in force and gross life insurance premium income and the responsibility of the Defendants for such failure to disclose.

So far as the Court has been informed, no direct evidence has been developed and none has been called to the Court's attention that any of the members of the finance and investment committee knew, in fact, that the assets were carried at values in excess of fair market values, although there is circumstantial evidence from which a jury could so conclude, according to the Plaintiffs. Plaintiffs have thus far failed to establish or present the evidence that such members knew or had reason to believe that there was an overstatement of gross life insurance in force against life insurance premium.

The question of valuation of assets, whether they be mortgage loans, real estate or bonds, is one upon which it has been indicated that the testimony will be divided sharply and the proof on behalf of the Plaintiffs' side of the equation will be difficult to muster and present. The valuation of some of the older bonds taken in the 1970 transactions will be difficult, on its own, because the deposition evidence indicates that those bonds have been or may have been since disposed of by Republic.

The general class claims against Republic's outside directors turn on questions of valuation also. There is no direct evidence at this stage of the proceedings that they knew of any overvaluation and it is contended by the Defendants that there is little, if any, circumstantial indication that there is evidence from which a jury could find that they were aware of any assets being carried at an inflated value.

The proof of liability in respect of the failure of Republic's financial statements to address the concentration of Republic investments with Realty Equities in the detail that the Plaintiffs contend for is certain to be contested at any trial on the merits of these actions. The accounting firm of Arthur Anderson and Company which served Republic in the period just before the inception of the time frame with which the classes are concerned was of the view that

such concentration should be disclosed whereas Peat, Marwick, which was later substituted as accountants for Republic, was of a contrary view.

Insofar as Republic's directors are concerned, it thus appears that it would be very difficult to establish any form of knowledge on their behalf that the failure to disclose such a concentration was in violation of any statutory accounting practice.

Realty Equities is presently in bankruptcy. Its directors and officers, other than three of the principals, are not shown to have had direct dealings with Republic, so far as the deposition proof and discovery has indicated. And the likelihood of success of proving their liability with respect to action taken by them as directors of Realty Equities is a difficult question to assess. It has also been indicated that the possibility of recovery of any substantial damages from those individuals is dubious, even if the proof will show liability on the part of these principals of Realty Equities. There is also the question that remains as to whether they have sufficient assets to satisfy any substantial judgment against them.

I have mentioned Neal Stanley previously. The case against him appears to be bottomed on his signature of an actuarial certification of Republic's 1970 statutory financial statements after Arthur Anderson and Company had refused to do so. Mr. Stanley was neither a member of Republic's board of directors nor a member of its finance and investment committee nor did he participate in the investment matters, so far as the Court is presently informed. Defendants contend that Mr. Stanley did not know or have reason to believe that his actuarial certification is incorrect or misleading in any respect.

In respect of the auditing firm of Peat, Marwick, there is a sharp dispute about the extent of its knowledge concerning the facts which did or should have caused them to question the carrying value of Republic's questioned assets and the implications and effects to be derived from such knowledge, if any. The indications are that the Peat, Marwick personnel involved in the Republic audit deny that any facts they possess were sufficient to put them on notice that the carrying values of any assets were overstated or that income was being improperly recognized. The Plaintiffs contend from the information that can be ascribed to Peat, Marwick, that they were put on notice respecting many assets, but they forthrightly recognize that proof of scienter would be difficult.

The second category of class actions before the Court is for convenience referred to as the Rubenstein case. That case entitled *Rubenstein against Republic* and others arises from the merger of Pacific National Life Assurance Company, "Pacific" hereafter, into Republic which was consummated in early 1971. The Rubenstein class has charged that:

A; Republic breached its warranties contained in the agreement of merger.

B; that Republic, Realty Equities and individual Defendants appeared to have made misleading statements of material facts and failed to disclose material facts relating to the financial condition of Republic in connection with and pertinent to the merger of Pacific into Republic.

And C; that Republic, Realty Equities and individual Defendants appeared to have violated the proxy rules contained in the Securities and Exchange Act in connection with the mailing of Republic's proxy statement to the shareholders on or about December 11, 1970, and Pacific's proxy statement to its shareholders on or about December 11th, 1970.

Although the Rubenstein class has not indicated that it has abandoned its claim for violation of the federal securities laws, it would seem that its claims for breach of warranty are sturdier and more readily susceptible of proof of the essential elements thereof. Here again, Republic and the individual Defendants who were parties to the Rubenstein action have denied that Republic breached its obligations of warranty or are liable in any other respect to the stockholders who turned in their Pacific stock in exchange for Republic stock under the merger terms.

A principal issue in the Rubenstein class suit will be whether a material adverse change occurred in the assets or liabilities or in the financial condition or business of the corporation between December 31st, 1969, the last certification date by Arthur Anderson and Company, and the date of the merger. There appears to be some uncertainty on this score because of the difficulty of establishing the effect of investment transactions that occurred in September and December, 1970, pertaining to the financial condition of Republic.

The Plaintiffs contend that the decline in the selling price of Republic stock following disclosure of the matters alleged to have been previously concealed, was a minimum of two dollars and twelve cents per share. And that this figure is the most likely measure certainly for settlement purposes of the damage sustained by the general class members who held their shares through February 7th, 1974. On the other hand, Republic rejects this contention and asserts that the most likely measure of damages is at least 50 percent less by reason of the fact that the market allegedly overreacted to the class action lawsuits, the SEC enforcement action and the suspension of trading and the state of supervision that was imposed by the Texas Insurance Commissioner on Republic.

It appears reasonable to assume that the measure of damages that could be claimed by a general class member must distill out general market influences which is an exceedingly complicated task fraught with many speculations and elusive elements. Plainly, on the assumptions submitted and which will be referred to in further detail below, even conceding liability, the measure of damages would not vary too substantially from the informed estimate made by Plaintiffs' Counsel albeit disputed by the Defendants.

Plaintiffs assert that $5.50 a share is the most likely measure of damage sustained by the Rubenstein class who held their shares through February 7th, 1974. Republic counters with the assertion that the most likely measure of damage is a dollar and a half for each member of the Rubenstein class who held his shares through February 7th, 1974. Here again, a reasonable measure of damage per share for each share of Republic acquired by a Rubenstein class member as a result of the merger and held by him until February 7th, 1974, is highly speculative, but it cannot be said to be more than fractionally in excess of the informed guesstimate made by Plaintiffs' Counsel.

I turn to the offer of settlement. The proposed settlement embraces all claims that are or could be asserted by the class members against Republic and other Defendants in the captioned class actions arising out of, based upon or related to the matters set forth in the complaints filed in these captioned actions and in the amended consolidated complaint. In all my references hereafter to the settlement, I'm, of course, referring to the agreement as amended and restated under date of August 19th, 1976.

The settlement agreement provides benefits for purchasers of the common stock of Republic during the period from September 1, 1970 to February 7th, 1974, except shares resulting from mergers with Republic or purchasers who requested exclusion, and held continuously until February 7th, 1974. These benefits are a maximum of $3,153,184 to be divided pro rata among the claimants according to their shareholdings, provided, however, that if fewer than the two million one hundred forty-nine thousand such shares are made the basis of valid proofs of claim there is to be paid in settlement a minimum of $2,733,184 divided among the total number of shares made the basis of valid proofs of claim.

The settlement agreement further provides benefits to the former holders of Pacific National Life Assurance stock who obtained on merger with Republic the shares of the latter and continued to hold the same on February 7th, 1974. To them will go a maximum aggregate payment for all such shares, $1,628,334 to be divided pro rata among the claimants according to their shareholdings, provided that if fewer than 600,000 such shares are made the basis of

valid proofs of claim there is to be paid a minimum of $1,448,334 to be divided pro rata among the claimants according to their shareholdings.

The settlement agreement further provides benefits for those who bought Republic stock between September 1st, 1970 and February 7th, 1974, excepting shares acquired by merger other than Pacific into Republic and those who requested exclusion, and who sold those shares between November 1, 1973 and February 7th, 1974, in an amount equal to $258,482 divided by the total number of all such shares made the basis of valid proofs of claim.

There is to be deducted from each category mentioned above a share of the fees and expenses awarded by the Court to attorneys and experts prorated to each category in proportion to the gross amounts payable to that category. Thus, the benefit to the general class would be subject to 62.56 percent of the aggregate fees and expenses awarded by the Court. The benefit to the Rubenstein class would be subject to payment of 32.31 percent of the aggregate fee awarded, fees and expenses awarded by the Court. And the payment to the class which for convenience denominated, those who sold out in the period mentioned above, would be subject to a payment of 5.13 percent of the aggregate fees and expenses awarded by the Court.

All present Defendants in the Republic actions are barred from participation in the benefits being paid in settlement.

█ In assessing benefit of a proposed settlement of a class suit the most important factor is the strength of the case for members of the class on the merits balanced against the settlement offer. Additionally, where that is possible, the Court must consider the overall ability to pay of the Defendants, the complexity, the length and expense of further litigation and the amount of opposition to the settlement.

This case, like every involved litigation, is fraught with difficult questions and the possibility of an adverse determination as to liability. The case, as presently set out, would be subject to a jury trial. At the heart of many of the Plaintiffs' claims are appraisals on real estate which Plaintiffs contend overstated the value of real estate. The Defendants have maintained consistently that Republic was entitled to rely upon the opinion of a member of the Appraisal Institute or a member of the Society of Real Estate Appraisers for determining the admissible value of real estate for mortgage loans made on the security of real estate. Such contentions go to the question of whether scienter can be established. In connection with each mortgage loan or real estate transaction here involved, the Plaintiffs discovered that Republic had received appraisals from members of the Appraisal Institute or the Society of Real Estate Appraisers which they claim supported the values of those various mortgage loans and real estate transactions as reported in the financial statements of Republic and as carried on the books and records of Republic. Those appraisals have been marked as exhibits in the record of this settlement hearing.

The Plaintiffs suggest that they discovered other evidence consisting of reappraisals performed in 1974 and commentaries made by State examiners concerning the properties, and the Plaintiffs contend that such evidence would support the argument that each of these properties was carried at a value in excess of its fair market value. Undoubtedly the Plaintiffs could anticipate expert appraisal testimony to the effect that the real estate market in general, of which the Court can take judicial notice, had suffered a decline in values during the time period involved in these actions. Consequently, the case would involve a battle of appraisal experts.

Seemingly, the Plaintiffs were faced with reluctance on the part of qualified appraisal experts to attack appraisals prepared by others within the same craft. Additionally, since the appraisals being attacked were prepared years ago, any expert produced would have had to value the property as of a prior date which made the task difficult and possibly in some cases unattainable.

The Plaintiffs have reported that the primary negotiators in the Republic-Realty transactions are deceased and that the Plaintiffs are consequently deprived of the opportunity to cross-examine the two men with the intimate knowledge of the facts and thus that the Plaintiffs would be forced to develop evidence of scienter as well as of the basic facts regarding the underlying transactions from secondary or circumstantial evidence and inferences based on voluminous documents.

From the information gleaned by the Plaintiffs and in the judgment of their coterie of Counsel who have labored with this case over a period of more than two years the settlement provides for a recovery substantially equivalent to that which would have been awarded as a Plaintiffs' verdict after a successful trial on liability. Plaintiffs have called to the Court's attention the diffusion of thought in respect to what formula should be accepted concerning the determination of damages in such cases. There is an absence of decided guidelines and possibly the rule that would ultimately be developed in a nondisclosure case, meaning a case where one takes the price before and after disclosure, would be a rule calling for out-of-pocket as damages. The attempt would be on the part of the Plaintiffs to pinpoint a discernible price drop between the time before and after the disclosure. This is particularly difficult in narrowly traded over the counter stocks. And self-evidently, the requirements of a causal connection to damages would necessitate the elimination of general market depreciation from an ascertainment of the economic detriment to Republic.

The Plaintiffs have submitted evidence which indicates standards to be drawn from the action of comparable stocks of comparable companies and the Dow-Jones Industrial Averages during the period in question. And it is their conclusion after reviewing the applicable authorities that the measure of damages most likely to be applied to the 10b–5 claims herein is the drop in the price of Republic common stock on disclosure of the true facts. In this connection it is shown that Republic's stock was suspended from trading on February 7th, 1974 when it was trading at a bid price of five and seven-eighths per share and reopened after the disclosure of the alleged fraud on April 23rd, 1974, at a bid price of three and three-quarters or an indicated drop of two dollars and twelve and a half cents per share. By calling attention to this phenomenon the Plaintiffs do not foreclose themselves from contending for a different measure of damage were these cases to go to trial. They say that they would argue that the measure should be the difference between the time of the wrongful acts which was about $15 a share discounted by the drop in the price of a relevant index less the price after disclosure.

On the other hand, the Defendants argue that the drop of two dollars and twelve and a half cents a share was exaggerated and overshot the impact of the alleged nondisclosures because of the prevalence of the SEC action, the class action lawsuits, the suspension of trading and the state of supervision imposed by the Insurance Commissioner, all of which occurred during this period, which had a shock effect, they say greater than the actual economic impact of the disclosures of the truth of the alleged overvaluations and their effect on the income of Republic.

The Plaintiffs have submitted estimates suggesting what they could foresee might be a recovery on the trial if liability were to be assumed. And on the basis of those estimates, which mathematically bear out the conclusion if the factual components are to be taken as correct, the Plaintiffs' Counsel say that it is their considered judgment that the settlement proposal is such that the Plaintiffs might well receive more pursuant to the proposed settlement than they would receive after trial in which they prevailed on issues of liability and damages. And that this applies both to the recoveries for the general class and for the Rubenstein class. In respect to the latter, the Plaintiffs conclude that Pacific shareholders are likely to obtain rescissional damages which would amount to five and a half dollars a share and, therefore, that their aggregate

potential damages would be $3,850,000. However, taking what is believed to be a reasonable estimate of the number of those eligible likely to make claims, the Plaintiffs calculate that in the Pacific class the claimants are likely to receive about a million one hundred fifty thousand dollars before the payment of legal fees, expert's fees and expenses, and this after a likely protracted trial and appeal during which the legal fees and expenses would mount.

It is very difficult to engage in the estimation of damages in this sort of case. But, it isn't the function of this Court at this time to try out the merits and to determine to a finite degree what the results might be. It is sufficient to follow an educated estimate or guess of what they could be, made in good faith and without any taint of self-interest where that is made by those to whom was committed the conduct of these cases.

The pertinent legal standards to be applied in considering a proposal of settlement such as that which we have before us have been collated and passed upon by this Court on a prior occasion in *Zerkle v. Cleveland-Cliffs Iron Company*, 52 F.R.D. 151 (1971) and they are substantially as follows:

 Approval of a compromise of representative litigation is based on a balancing of likelihoods rather than an actual determination of the facts and applicable law. The ultimate test of the exercise of the discretion of the Court is the interest of the class. A compromise will be approved as fair, reasonable and adequate if it serves that interest. The proponents of a compromise have the burden of proving its fairness. The Court is the guardian of the absent class members. It must therefore exercise judgment based on careful judicial scrutiny in passing on the fairness of the settlement. It is often been said that; "The bird in the hand is to be preferred to the flock in the bush and a poor settlement to a good litigation."

The Court will not substitute its business judgment for that of the parties. The only question is to whether the settlement as a whole is so unfair on its face as to preclude judicial approval. And in determining whether to approve compromise, the Court does not try out the disputed issues. The compromise is agreed to for the purposes of avoiding just that.

Stockholder litigation is notably difficult and unpredictable and in these circumstances the courts have displayed a healthy skepticism in the face of optimistic forecasts or large demands. In such cases a rational appraisal of the doubts and uncertainties which affect any prognosis of recovery are such as to make the solution which has been arrived at by the ultimate compromise, a desirable and fair disposition of the controversies.

 There are present in these cases serious questions of law which stand in the way of a recovery for the Plaintiffs and taken together with the difficulties of proof, the uncertainties of law and other foreseeable obstacles to success, favor a compromise of the litigation.

In any case, there is a range of reasonableness with respect to a settlement. A range which recognizes that uncertainties of law and fact exist and the competent risks and costs necessarily inherent in taking any litigation to completion.

The Plaintiffs have had extensive pre-trial discovery. They report that they have taken 8,321 pages of testimony from 72 witnesses and read and analyzed and digested thousands of pages of documents discovered in the course of the proceedings. They have had the benefit of various data assembled by the Securities and Exchange Commission and the Insurance Commissioner of the State of Texas, including the latter's voluminous report on Republic's affairs. They have thus had before them material on which to make an informed evaluation of their case and to negotiate with full knowledge of the relevant factors.

The sole Objectors make two main points. They contend that the notice to stockholders was defective and the settlement was inadequate. However, analysis convinces the Court that the challenges individually and collectively by these joint owners lack

merit and fundamentally are uninformed, speculative and insubstantial.

To restate the objections, they are that the settlement is not fair, reasonable and adequate because it is based on a short claim period of only 45 days which can only be complied with by large sophisticated investors whom Republic wishes to pacify. No evidence whatever to support the suggestion that Republic seeks to pacify anybody in this mode was adduced at these hearings.

As a second matter, the Objectors say that wrongdoing individual Defendants in these consolidated actions caused in part the losses to the classes and the general class and are not barred by the express language in the settlement agreement from participation in the settlement. This statement, completely erroneous, is repeated in at least three or four places of the written objections filed.

To the contrary, the settlement agreement specifically bars out present Defendants from participating in the benefits of the settlement.

The third objection is that the settlement amounts to the general class is far less than the actual losses of the class members and is less than two other settlements claimed to be comparable hereto that have been approved in the consolidated proceedings. As an adjunct to that objection it is suggested that the subclasses under the settlement, namely the general class and the Rubenstein class are treated differently without justification.

And in furtherance of the same tenor of objection, the Objectors state that the amounts to be paid to claimants under the general class settlement are not based upon or limited to actual losses but rather upon an artificial amount which perhaps might even profit certain, "large sophisticated investors," to recover their losses entirely and to an excess amount. And that individual members probably would not have time to file claims.

Additional statements of objection which appear to the Court to be contrived and insubstantial are also set out.

■ Due process requires that notice of a proposed settlement be given to the class. The notice must be reasonably calculated under all of the circumstances to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections, but must reasonably convey the terms of the proposal and the options that are open to the class members in connection with the proceedings. The notice may consist of a very general description of the proposal together with a summary of the monetary benefits to flow therefrom to the class, and an estimate of attorneys' fees and other expenses claimed against the recovery. The class members are not expected to rely on the notice as a complete source of the settlement information, especially where any ambiguity therein can be cleared up by obtaining a copy of the agreement or an inspection thereof.

The authorities support the Court's exercise of its discretion regarding the manner in which the notice was given and the time frame allowed for filing of exclusion requests and for preparing for the settlement hearing and for filing proofs of claim. A number of cases have indicated that all of the requirements imposed in this case are well within the framework laid down by the authorities.

*Grunin v. International House of Pancakes,* 513 F.2d 114 at 121 (8th Circuit, 1975); *Manhattan Ward, Inc. v. Grinnell Corp.,* 490 F.2d 1183, at 1184 (2nd Circuit, 1974); *In re Four Seasons Securities Laws Litigation,* 493 F.2d 1288 (10th Circuit, 1974) and *In re Antibiotic Antitrust Actions,* 333 F.Supp. 291 (S.D.N.Y.1971).

■ The Court finds, as the notice clearly specifies, that the Court had determined that certain actions might be maintained as class actions; that the time period for the filing of proofs of claims is, under the circumstances, fair and reasonable and sufficient, and not oppressive; that the notice of class action and hearing on this proposed settlement was mailed pursuant to order dated July 19, 1976, and fairly and reason-

ably describes the amounts to be paid by Republic including the obligation for attorneys' fees, experts' fees and expenses; that the notice makes specific reference to the settlement agreement which was available to any interested party; and that it was not necessary that the notice describe the provisions under the terms of which Republic would have the option to cancel all or part of the settlement agreement; that the notice, as well as the settlement agreement, makes it clear that the individual Defendants were making no contribution to the settlement and were being released and that the notice spoke definitively to the question of the difference which Republic would be required to pay depending upon the number of claims filed.

One of the objections made by the joint owners who objected herein complained of a comparison that could be made of the disposition of this case with the settlements that were made in the companion *Garrett* and *Synercon* cases. Suffice it to say that there are valid reasons for giving greater weight per share to Pacific claimants than to open market claimants because of the differences of the underlying basis for claim. And that there was sufficient basis to distinguish between these classes in the manner in which the distinction appears in the results and the benefits to the classes.

The characteristics of the time periods on which the Plaintiffs in the class actions have focused are much broader than those in *Garrett* and *Synercon*. And the attempted contrast and comparison between the settlement herein and the settlements of those other cases and the time frames do not express any meritorious position. The amounts that have been offered here in settlement bear a reasonable relationship to the amount which might be recovered even if that cannot be determined to a finite degree—and it is unnecessary to do so as indicated previously—when discounted by the difficulties of proof, the available defenses and the Court uncertainties and delays of trial. Self-evidently, it is extremely difficult to even guess what would be the maximum liability of the Defendant, but it appears fairly clear that the terms of settlement are within the bounds of fairness, reasonableness and adequacy.

Having invested more than two years and thousands of working hours in the pre-trial proceedings Counsel for the Plaintiffs, nevertheless, have concluded that the case is more wisely settled on favorable terms than tried on the shaky hope of success to be crowned with greater benefits.

In arriving at my conclusion as to the fairness and reasonableness of the settlement and the absence of justifiable objections thereto and to the procedures employed to give notice thereof and the time frames for claims to be filed, I do not single out any factor as decisive. I've given consideration to the combination of all elements.

Accordingly, I decide and find that the settlement should be in all respects confirmed and the parties are accordingly directed to carry the same into effect.

There remains the question of the reasonable allowance of compensation due to the parties who have led these cases. Applications are before the Court for allowance of fees and expenses for Counsel for the class and the accountants who served them. The lawyers for all the Plaintiffs in these class suits seek a joint allowance of fees to cover their services in the amount of $1,300,000, and an aggregate disbursement of $75,-431.74. They say that the value of their unpaid services taken on a noncontingent basis was $519,573.47; the accountant's petition for allowance of compensation in the amount of $90,000; and out-of-pocket expenses of $2,585.36. They say that the value of their services taken on a noncontingent basis is $60,536.

Under the agreements between the parties as indicated above, a gross settlement fund of a maximum of $5,040,000 and a minimum of $4,440,000 has been created for the benefit of the several classes. It is from these benefits that the fees and expenses awarded are to be paid, to be prorated as previously indicated to each of the separate classes.

The services of Counsel and their accountants were undertaken on a contingent basis and they have not received any compensation other than $25,000 awarded to liaison counsel in June, 1975, for their services in the companion case entitled *Garrett against Republic National Life Insurance Company,* one of the constituent cases initiated in Texas and covered by the multidistrict panel Order of Transfer of Republic litigations mentioned previously.

The *Garrett* case was settled separately in 1975 for the sum approximately three and a half million dollars. Fees allowed to Counsel therein by the Court sitting in the Northern District of Texas amounted to an aggregate of $350,000 including the $25,000 paid to Mr. Wechsler's firm.

The Court has considered and evaluated the services rendered by the attorneys and accountants under the guidelines prescribed in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Circuit, 1974) and *City of Detroit v. Grinnell,* 495 F.2d 448 (2nd Circuit, 1974). Briefly these factors include the novelty and difficulty of the questions dealt with, the preclusion of other employment by the attorneys due to acceptance of the cases, customary fees, whether the fee is fixed or contingent, time limitations imposed by the clients or circumstances, the amounts involved and the results obtained, the experience, reputation and ability of the attorneys, awards in similar cases and the fact that an element of public service is involved in seeking and accepting employment as counsel for a judicially determined class, that representation of the class by counsel is not a result of private enterprise but results from provision of an opportunity to represent the class by a judicial determination, and that the policy of the law in class actions is to provide a motive to private counsel to represent the public and to enforce the law.

The lawyers have shown here that they and their assistants, including paralegal help, have from March, 1974 to date spent an aggregate of approximately 6,375 hours on these cases and that they have asserted what they regard as their noncon-

tingent billing rates for each person who contributed services included in the total. The Plaintiffs' Counsel as a group in their joint claim assert that they would at regular charge to their clients, on a noncontingent basis, be entitled to receive a fee of $568,417.25 less $23,843.78 representing an allocation of five percent of their time to the derivative cases which they are also involved in and which are not part of the settlement and an amount of $25,000 received as a fee in the settlement of the *Garrett* case or a fee of $519,574.47.

The accountants who have filed claim have shown that they spent an aggregate of 661 hours reviewing and analyzing Republic's financial data, examining working papers of Republic's various accountants, examining pleadings and exhibits herein, the various depositions that have been taken and assisting Counsel in his efforts on deposition and discovery efforts. For those services they estimate the reasonable charges that they say they would normally make for the time involved at a total of $60,536. For this in their words they, "request a reasonable and modest fee of $90,-000". The path of the Plaintiffs in these cases was blazed and well defined by a two-year Securities and Exchange Commission investigation and its institution of injunctive proceedings in which the basic claims asserted here were all laid out and which articulated the perimeters now contained in the several complaints. Obviously certain embroidery was added through persistence and diligence of Counsel for Plaintiffs in these cases. However, it cannot be fairly disputed that these cases come very close to nearly being in the category of collection claims subject, of course, to the vicissitudes of litigation and the assertions of defenses that had to be met and overcome.

In the Court's opinion in the *SEC* case reported at *Securities & Exchange Commission v. Republic National Life Insurance Co.,* D.C., 378 F.Supp. 430 and following, this Court noted in July, 1974, well before these cases were really under way that "The SEC has persuasively indicated, at

least for present purposes, that in essence this case presents an outrageous example of massive and serious violations of the securities laws by Realty Equities and by Republic involving numerous sham transactions designed to artificially inflate the reported income and assets of Realty and Republic and also permitting the rake off by Realty, for no real consideration, of many millions of dollars of Republic's funds. The SEC argues that the significant facts asserted in the complaints have not been denied."

Parenthetically it may be noted that all parties to the SEC cases ultimately consented to injunctions.

Additionally there was a comprehensive investigation of Republic's affairs by the State Commissioner of Insurance of the State of Texas which was available to Counsel herein as a charter on which to proceed. The SEC suit was filed on March 8th, 1974. But prior thereto on February 27th, 1974, the Texas Commissioner of Insurance had issued an order placing Republic in a state of supervision pursuant to the Texas Insurance Code. On February 28th, 1974, the Commissioner of Insurance had appointed a supervisor who was directed to assume control of Republic, of all records concerning Republic's investments. And a very comprehensive report of the financial affairs of Republic emerged from that control.

The elements of novelty or difficulty of matters involved and the skill called for and employed and the reputation of the lawyers at the Bar, while requiring subjective assessments, can be evaluated by a court which has closely supervised and observed the progress of these cases. It does not appear that the attorneys involved herein were precluded from other employment due to the acceptance of these cases. They were not exclusively employed during the two-year span of these cases. Their remaining available time was applied in other directions.

In the judgment of the Court, the claimed amounts styled as the amounts that would be ordinarily billed to a noncontingent client are well in excess of the order of magnitude that a private purchaser might be willing or be expected to commit himself for on a noncontingent basis for the services required herein. The matters involved were fairly straightforward even if there were many of them, and required only ordinary skill in well plowed fields of law where the chief requirements imposed on Counsel were persistence and diligence in tedious but uncomplicated tasks. The yardstick for compensation provided by the fee application of liaison counsel in seeking compensation out of the fund created in the *Garrett* cases is nowhere near the rates of compensation claimed out of this fund. The responsibilities of liaison counsel in respect to the pre-trial services in *Garrett* were not essentially different, although the primary concern for the case was essentially that of counsel of record in *Garrett* who were also responsible for negotiating and procuring the settlement there. The fact remains that the hourly rates indicated in the claims for services in *Garrett* and in these cases are sharply disparate.

The Court has considered the application of the persons who have applied here for awards. In the light of all the prior proceedings and the entire record of these captioned Rubenstein and Miller cases and the matters and argument submitted at the hearing held on August 18th and 19th, 1976, and under the peculiar facts and circumstances in these class suits, including the initiative and the essential nature of the services required and performed, the Court after due deliberation finds that an allowance of the following amounts respecting attorneys' fees, accountants' fees and expenses as set forth hereafter gives due regard to the contingency factors involved and compensates the necessary services and represents the fair, reasonable and proper award chargeable proportionately against the three respective funds created by the settlement and payable therefrom.

Upon the joint application of Counsel there is awarded as fees $519,573.47 and $75,431.74 as disbursements making the total $595,005.21.

■ To the Plaintiff's accountant there is awarded as fees the sum of $45,000 and disbursements of $2,585.36 for a total of $47,585.36.

The clerk is directed to enter an order to be submitted containing the amounts recited above to be added at the foot of the decree to be presented herein.

The foregoing shall constitute the findings of fact and conclusions of law required by Federal Rules of Civil Procedure, 52(a).

The Court has before it a form of order which has been examined and is deemed satisfactory. And that will be signed and filed with the clerk. An order and final judgment with respect to the award of attorneys' fees should be prepared for the Court's signature which will state the amounts found by the foregoing findings and conclusions, all of which are so ordered.