AMERICAN BASKETBALL ASSOCIA-
TION PLAYERS ASSOCIATION, an un-
incorporated association, by James Ea-
kins its President on its behalf, et al.,
Plaintiffs,

v.

NATIONAL BASKETBALL ASSOCIA-
TION, a Joint Venture, et
al., Defendants.

No. 75 Civ. 6184.

United States District Court,
S. D. New York.

Nov. 19, 1976.

Lovejoy, Wasson, Lundgren & Ashton, Professional Corp., by Edwin E. McAmis, Daniel J. Sullivan, Douglas Foster, New York City, for plaintiffs.

Smith, Cohen, Ringel, Kohler & Martin, by Prentice Q. Yancey, Jr., Atlanta, Ga., for plaintiffs.

Proskauer, Rose, Goetz & Mendelsohn, by Michael A. Cardozo, David J. Stern, Richard L. Wasserman, New York City, for defendants NBA and NBA Teams.

Spengler, Carlson, Gubar, Churchill & Brodsky, by Robert S. Carlson, William J. McSherry, Jr., New York City, for defendants Long Island Sports, Denver Nuggets, Inc., Arena Sports, Inc., and San Antonio Basketball, Ltd.

Paul, Weiss, Rifkind, Wharton & Garrison, by George P. Felleman, New York City, for defendants Madison Square Garden Corp. and Madison Square Garden Center, Inc.

Michael H. Goldberg, New York City, for American Basketball Ass'n.

## OPINION

ROBERT L. CARTER, District Judge.

This is a companion to *Robertson v. NBA,* 67 F.R.D. 691, in which a class settlement was approved on July 30, 1976. On September 14, 1976, an order was filed approving the proposed settlement of the instant controversy, with opinion setting forth the basis for the court's approval to be filed subsequently—what follows is the court's rationale for concluding that the settlement warranted judicial approval.

*Background Facts*

Late in August, 1974, the American Basketball Association Players Association (ABAPA) moved to intervene in *Robertson,* was allowed to withdraw the motion as technically defective and was granted permission to file a new motion on or before September 20th. ABAPA, however, changed its mind about intervening at that time, and took no further action in that regard until November, 1975, when it again sought to intervene. That motion was denied in an endorsement filed on December 5, 1975, on grounds of untimeliness and the possibility of prejudice to the parties in *Robertson.*

On December 8, 1975, ABAPA, James Eakins and Julius Erving instituted the instant lawsuit. Initially, the defendants were the National Basketball Association (NBA) and its member clubs, plus the Denver Nuggets Basketball, Ltd. (Denver Nuggets) and the Long Island Sports Enterprises, Inc. (New York Nets). The allegations in the complaint substantially tracked the cross claims of the American Basketball Association (ABA) against the NBA and the allegations of plaintiffs in *Robertson.* The NBA was charged with an unlawful conspiracy and combination to effectuate a monopoly in professional basketball, to eliminate the ABA as a viable organized league, and to restrain trade in player skills through the college draft, the option clause, the reserve compensation rule and the like, in violation of the federal anti-trust laws. Shortly after instituting the action, plaintiffs moved for a preliminary injunction seeking to bar a scheduled NBA special draft of various ABA players. After an evidentiary hearing, injunctive relief was denied because "[t]here has been no credible evidence establishing [a] scheme or conspiracy by the NBA to eliminate the ABA" (*see* opinion filed December 19, 1975).

Thereafter between December, 1975, and July 15, 1976, the complaint was amended three times. In its final and present form the complaint is brought on behalf of a class, defined as "all persons who are or at any time have been active players in the [ABA] since December 8, 1971 and prior to entry of final judgment in this action." (Third Amended Complaint, par. 16). The members of the class are said to number "approximately 252 players". *Ibid.* In addition to the successor entities to the original defendants, the current pleading names the ABA, the Arena Sports, Inc. (Indiana Pacers) and the San Antonio Basketball, Ltd. (San Antonio Spurs) as defendants as well. The latter two clubs, along with Denver and New York, are charged with aiding and abetting the NBA conspiracy to destroy the ABA.

On January 9, 1976, plaintiffs moved to enjoin merger discussions between the NBA and ABA without representatives of the ABAPA being present where such discussions touched upon player rights and interests. Counsel for defendant NBA voluntarily agreed to keep the ABAPA informed and that motion was not pressed.

In February, 1976, substantial agreement in respect of settlement of *Robertson* was announced by the NBA and the players. On March 2, 1976, plaintiffs moved for a class action determination. On April 5, 1976, defendant NBA moved to dismiss the action and on April 20, 1976, James Eakins and Julius Erving, two of the individual

plaintiffs in this action, moved for partial summary judgment enjoining enforcement as to them of the NBA draft.

By April, 1976, it was clear that negotiations in *Robertson* were proceeding to a satisfactory conclusion, and the court suggested that the parties in this action make a similar effort to settle this controversy. The parties agreed to explore the possibility of reaching a satisfactory compromise and to postpone the determination of all pending motions pending the outcome of their effort to come to terms among themselves. Discussions proceeded into July when tentative agreement was reached.

*The Terms of the Proposed Settlement*

On July 26, 1976, the court determined that the action could be maintained as a class action pursuant to Rule 23(b)(1), F.R. Civ.P. The proposed settlement was filed with the court on July 30, 1976, and hearing on the proposal was set for September 7, 1976. Notices were sent to members of the class describing the substance of the terms of the proposed settlement, advising them of the September 7 hearing date and that August 30 was the cutoff date for the filing of objections to the settlement. Such notices were also furnished in the August 14 (available on all newsstands by August 7 and mailed to subscribers by August 5) and the August 21 (available on all newsstands by August 14 and mailed to all subscribers by August 12) issues of the Sporting News.

The settlement provides for expansion of the NBA to include the Denver Nuggets, the New York Nets, the Indiana Pacers, and the San Antonio Spurs, (hereafter collectively referred to as NBA expansion teams), and a dispersal draft of Kentucky and St. Louis players.[1] Those players on the roster of the Kentucky, St. Louis and Virginia Clubs [2] not selected in the dispersal draft and not employed as of July 26, 1976, were declared free agents. That is, they were entitled, without restriction (except for certain Virginia players who were free agents subject to compensation), to seek employment with any NBA club of their choice including the NBA expansion teams. The NBA expansion teams agreed to pay and guarantee payment of the ABA contracts of various ABA players on the rosters of ABA teams at the end of the 1975–76 season who do not secure NBA employment for the forthcoming 1976–77 basketball season. The undertaking also provides that if, in the forthcoming season, such an ABA player is employed at a lower rate of pay than he was entitled to receive under his ABA contract, the difference will be paid, in the case of a no-cut contract, until the terms of the ABA contract expires. In respect of any other affected player employed at a lower salary, the NBA expansion teams obligated themselves to make up the difference between the ABA contract and the current NBA contract for one year, and if the player is cut before the end of the 1976–77 NBA season, to pay ½ of the difference between what his ABA contract called for and his contract for the forthcoming season for the balance of the term of the ABA contract. The NBA expansion teams also agreed to guarantee to certain players who were on the roster of Virginia, St. Louis or Kentucky at the close of the 1975–76 season and listed in Exhibits M and N to the settlement agreement, all deferred compensation incurred prior to the 1976–77 playing season, and to pay $450,000 to the ABAPA to be allocated to players on the rosters of the San Diego, Utah and Baltimore clubs at the time those organizations ended operations who had not been subsequently employed during the 1975–76 season by an NBA or ABA team. The settlement also insures funding of the ABA retirement plan in order to provide for early retirement at age 45 and normal retirement at age 55 for all ABA players retiring

---

1. These clubs completed the ABA 1975–76 season, were not taken into the NBA, and pursuant to agreement among them and the NBA expansion teams engaged that they would not oppose the movement of NBA expansion teams from the ABA to the NBA.

2. The Virginia Squires ceased operating shortly after the end of the 1975–76 regular playing season.

between the start of the 1972–73 playing season and the beginning of the 1976–77 playing season; pension rights and privileges for ABA players equivalent to that provided NBA players; and to give ABA players playing in the NBA credit for their years in the ABA as if the two leagues had always been one. The NBA expansion teams have also agreed that the improved benefits now guaranteed in the ABA pension plan extends to all ABA players now in the NBA who were on a roster of an ABA team, including Baltimore, at the start of the 1975–76 ABA basketball season.[3] It is also agreed that the modification in NBA practices and procedures made under the settlement terms in *Robertson* apply to former ABA players who sign with an NBA team. The court is to retain jurisdiction and the Special Master appointed to enforce the *Robertson* agreement is to arbitrate and enforce the terms of this settlement as well.

The agreement contains a discharge and release of all claims against and a covenant not to sue the NBA, ABA and the NBA expansion teams in respect of any matters alleged or arising out of allegations in the complaint or settlement. It also contains a release of all contract claims by all players in the dispersal draft, certain former Virginia players to whom the settlement provides payment of deferred compensation earned for services rendered prior to the NBA 1976–77 season, and by those players on the rosters of the Baltimore, San Diego and Utah clubs at the time those clubs ceased operation, among whom the $450,000 fund is to be dispersed. No other individual contract rights are affected.

## The Settlement Negotiations

The settlement was negotiated under very trying circumstances. Rumors of the ABA's imminent collapse were commonplace as early as December, 1975. Early in 1976 several ABA club franchises, certain that the 1975–76 season was the ABA's last,

put out feelers in regard to entry into the NBA. Representatives of the NBA and the ABA agreed in May or early June that a proposal for entry of four ABA teams into the NBA would be placed on the agenda for formal consideration at a June meeting in Hyannisport, Mass. of NBA club owners.

Aware of the imminent collapse of the ABA and of the proposed expansion of the NBA to include several ABA teams, Prentiss Yancey, ABAPA General Counsel, was in daily contact during the three week period prior to the NBA meeting at Hyannisport with James S. Eakins, ABAPA president, Julius Erving, Artis Gilmore, George Irvine and members of the ABAPA Executive Committee, discussing this lawsuit, what course to take in the event the ABA went out of business, and possible settlement terms that would best protect ABA players. Yancey went to Hyannisport in mid-June to participate in the discussion between NBA owners and ABA representatives, and at that time agreed to the general terms of the settlement, which was formalized in July.

ABAPA officers and player representatives were advised of the substance of the Hyannisport discussions. The specific and final terms of the settlement were negotiated by Yancey, Eakins, Erving and other ABAPA officers. Members of the Executive Committee were kept abreast of the settlement discussions by telephone. On July 7, 1976, ABAPA representatives met in Atlanta and personally considered and approved the terms of the settlement. The substance of these July 7, 1976 discussions was communicated by ABAPA officers and player representatives to the players, and every active player was sent a letter containing the terms of the proposed settlement.

## Objections to the Settlement

Objections were filed by David Twardzik, Melvin Bennett, Luther Burden, Dwight

---

**3.** Several days before the settlement was reached in this case, a dispute arose as to the proper interpretation of ¶ 9b on page 29 of the settlement agreement, which paragraph deals with the upgrading of pensions of certain ABA players so they meet NBA standards. Defendants agreed to accept the court's interpretation of this provision as set forth above. *See* letter of Robert S. Carlson, dated September 8, 1976.

Lamar, Marvin Roberts, Mack Calvin, John Roche, Kevin Joyce, Joe Caldwell, Swen Nater and David Vaughn. There is objection because no provision is made in the settlement agreement to guarantee that various of the objectors as a result of signing to play for NBA clubs will not receive lower compensation than their ABA contracts specified and because no provision is made for deferred compensation as to the objectors. There is also opposition to the settlement because it is feared that various breach of contract claims against the ABA and its former clubs may be extinguished. In addition representatives of the San Diego club and the Virginia club were present at the hearing but their presence was not in opposition to the settlement. Rather the purpose of the San Diego club was to oppose dissolution of the injunction barring an NBA–ABA merger, and that of the Virginia Squires was to monitor the settlement to insure that the club's claims against the ABA were in no way affected at the settlement hearing.

*Discussion*

A settlement hearing is not a substitute for a trial, and the court's function does not encompass determining the controversy on the merits. *United States v. Allegheny-Ludlum Industries,* 517 F.2d 826, 845 (5th Cir. 1975). Rather, the court must be satisfied that the parties acted prudently in achieving the specific advantages gained through compromising the litigation and in eliminating the risks attendant upon a trial on the merits. *United States v. Allegheny-Ludlum Industries, supra; City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974). The court must evaluate the terms of the settlement to determine their fairness, wisdom, reasonableness and adequacy, *See City of Detroit v. Grinnell Corp., supra* at 463; *West Virginia v. Chas. Pfizer Co.,* 314 F.Supp. 710, 740 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079, 1086 (2d Cir. 1971), *aff'd,* 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1972); and the mere fact that some members of the class oppose the settlement does not necessarily render it unfair or unreason-

able, *Abate v. Pittsburg Plate Glass Co.,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974).

The reasons for approval of the settlement are perhaps even more compelling than those articulated as requiring approval in *Robertson.* The ABAPA was confronted with the reality of the ABA no longer being able to operate as a league after the 1975–76 season. The Baltimore, San Diego and Utah clubs either could not start the 1975–76 season or were forced to go out of business before the season closed. The Virginia club went out of business shortly after the end of the 1975–76 regular playing season. The demise of the ABA had become all but a fait accompli early in 1976, and a number of the remaining viable franchises began to seek entry into the NBA. The acceptance of four ABA clubs into the NBA under the settlement terms means that the players on those clubs will be playing next season. The dispersal draft means employment for some ABA players recognized as having above average talent. Those not drafted and not employed are free agents and may seek to compete for placement on team rosters in the NBA. The objective sought in the settlement is to provide employment opportunities to a maximum number of ABA players. Unless the settlement is approved, the NBA expansion teams will not be able to play in the NBA or indeed to operate at all. Thus, all but a few ABA players will have no future life as basketball players, no pension benefits and no hope of obtaining deferred compensation earned prior to the 1976–77 season. The thousands of dollars invested in the franchises of NBA expansion teams will be jeopardized, and virtually all of professional basketball will be thrown in chaos. These reasons alone necessitate approval and surely are strong indicators of the fairness, reasonableness, wisdom and adequacy of the proposal. *See West Virginia v. Chas. Pfizer & Co., supra,* 314 F.Supp. at 740.

Moreover, the settlement merits approval when measured by those standards which our Circuit in *City of Detroit v. Grinnell Corp., supra* at 463, has articulated as the

critical factors to be taken into account by the court in approving a settlement. This litigation is of similar complexity to *Robertson* and, if continued, would match that case in expense. A trial would be of indeterminate duration, but surely a trial of a month or more would be required on the question of liability. Assuming liability were established, the damage claims of 252 class members would then have to be tried, and obviously another month or more of trial time would be required.

The settlement is welcomed in general by all members of the class because continued employment for some is guaranteed, assured payment of past ABA obligations and the assumption by the NBA expansion teams, in part, at least, of indicated ABA contract obligations provides protection for others. Pension rights of ABA players are now assured, enlarged and vested, and a $450,000 sum for members of the class who were on the San Diego, Baltimore and Utah clubs when they went out of business is provided. While the ABAPA has not itself engaged in much extensive discovery as to the complaint of NBA player practices and regulations and NBA activity allegedly designed to eliminate the ABA from professional basketball, such discovery had been virtually completed by plaintiff players and cross claimant ABA in *Robertson*. Thus a great mass of discovery was clearly available to plaintiffs in this case. This litigation is primarily directed against the NBA player practices which were virtually identical to those of the ABA. The real and underlying purpose of this litigation, however, was to protect the jobs of ABA players by enjoining the NBA and the NBA expansion teams from driving the ABA out of business. Certainly, the settlement achieves that purpose to an extent litigation could not. The data produced in court reveals the ABA was in desperate financial straits and could not have continued operations in 1976–77 simply because it had neither the funds nor the financial prospects to do so. While the settlement formalizes the ABA's demise, employment opportunities for ABA players are preserved.

The position of the ABAPA in a trial would be considerably weaker, in my judgment, than that of plaintiffs in *Robertson* in regard to the prospects of successfully establishing liability. While obviously, at trial, proof that the NBA was seeking to drive the ABA out of business could be expected to be somewhat more extensive than that presented at the December, 1975 hearing on plaintiffs' motion to enjoin certain NBA acts as designed to run the ABA out of business, the failure or inability of plaintiffs to present convincing proof on their motion at the December hearing is, at least, some indication of the difficulty plaintiffs would face at trial.

Moreover, proof of damages is even more problematical than in *Robertson* because plaintiffs would be asking a jury to assess damages which ABA players suffered because of NBA player regulations, not because of the player restrictions of the league in which they played. My own assessment is that a jury award under such circumstances is highly doubtful.

The NBA expansion teams are going into the NBA with hopes and expectations of reviving their faltering franchises. These teams have assumed some of the basic obligations owed by the ABA and its defunct clubs to ABA players. They are undertaking heavy financial obligations for the benefit of the class. In addition, they have incurred even greater financial obligations for the price of admission into the NBA. They also must meet their current payrolls and other monetary liabilities incident to fielding the four expansion teams in the coming season. Fulfillment requires strengthened franchises under NBA auspices. Unless the requisite financial resources are available, the terms of the settlement requiring expenditures by the NBA expansion teams will not be met, and imposing heavier financial undertakings could imperil all expected benefits the settlement proposes to produce. Thus, it seems to the court that the plaintiffs have exacted a not inconsiderable price from the NBA expansion teams for giving up their right to pursue an expensive and lengthy law suit,

the outcome of which would be uncertain at best, but with the odds heavily weighted against success. Weighing all these factors the court has no doubt that the settlement warrants approval. *See City of Detroit v. Grinnell Corp., supra.*

The objections based on concern that various contract and other claims against the ABA and its former member teams will be considered waived by the release and covenant not to sue in par. 6 of the agreement has been clarified by letter dated September 2, 1976 and made an integral part of the agreement. Joe Caldwell, in the light of that letter and explanation at the hearing, has withdrawn his objection. In any case, the release and covenant not to sue in the agreement could only bind class members in respect to those matters involved in the litigation, settlement or in respect of matters incident thereto. Breach of contract claims (except as set forth above) against the ABA or its former member clubs are clearly not in that category and are not waived by this agreement. Accordingly, the objections in this category have no merit.

The other objections go to the fact that the objecting players are not being guaranteed back salary, deferred compensation or guarantee against being paid less compensation in the 1976–77 season than their ABA contract provided. All the objectors with existing ABA contracts which covered playing seasons after the 1975–76 season had declared themselves free agents and had signed with an NBA club before the settlement of this action. The contracts of certain of the other objectors had expired or had been cancelled by the end of the 1975–76 season. Hence, it is correctly urged that there was nothing to guarantee in those cases.

As for those objectors, however, whose ABA contracts had not expired, the failure to provide for deferred compensation etc., for them is based on the fact that these players did not wait for the settlement to be reached. On the contrary, they signed with NBA clubs immediately. When the settlement terms were ironed out, the tal-

ents of these players were not available in the dispersal draft and, therefore, unavailable to give assistance to the NBA expansion teams in financing the terms of the settlement. The fund realized from the dispersal draft will be available, in part, to be credited to the NBA expansion teams in respect of the price they are required to pay for entry into the NBA. The players knew that negotiations were underway, but felt obliged to protect their future by signing with an NBA team at once. While the court cannot fault the players for looking out for themselves, they did put themselves in a class separate and apart from those for whom payment of past due obligations and guarantee against loss is being assumed. Class counsel sought to have the NBA expansion teams assume for these players the same obligations it assumes for players listed in Exhibits G, M and N attached to the agreement, but without success. The difference in treatment is not unreasonable. While these objectors do not have their ABA contracts guaranteed, they benefit in improved pension rights.

The settlement certainly protects the rights of all members of the class, including the absent members. *See Feder v. Harrington,* 58 F.R.D. 171 (S.D.N.Y.1972); *Zerkle v. Cleveland-Cliffs Iron Co.,* 52 F.R.D. 151 (S.D.N.Y.1971). Furthermore, as all objectors have appeared before the court by counsel representing them, approval of the settlement raises no due process problems.

Because the settlement, on balance, is fair and reasonable, its approval was warranted.

IT IS SO ORDERED.