**TBK PARTNERS, LTD. and Julius Garfield, individually, on behalf of shareholders of the Gold and Stock Telegraph Company similarly situated, and derivatively in the right of and for the benefit of the Gold and Stock Telegraph Company, Plaintiffs,**

v.

**WESTERN UNION CORPORATION, the Western Union Telegraph Company, the Gold and Stock Telegraph Company, Walter E. Girardin, Calvin E. Darrin and Richard C. Hostetler, Defendants.**

Nos. 80 Civ. 3807(MP), 80 Civ. 7403(MP).

United States District Court,
S. D. New York.

June 22, 1981.

As Amended June 25, 1981.

Wachtell, Lipton, Rosen & Katz by Herbert M. Wachtell, Theodore N. Mirvis, New York City, for defendants.

Hays, St. John, Abramson & Heilbron by Morris Shilensky, Edward J. Walsh, New York City, for objectors.

Lowey, Dannenberg & Knapp by Burton L. Knapp, New York City, for plaintiffs TBK Partners, Ltd. et al.

Nemser & Nemser by Stanley Nemser, New York City, for plaintiffs Julius Garfield, et al.

## OPINION

MILTON POLLACK, District Judge.

The parties to this consolidated class and derivative action have negotiated and submitted to the Court a proposed settlement for approval pursuant to Rules 23(e) and 23.1 Fed.R.Civ.P. Notice by mail and by publication has been given to all interested parties and a hearing has been held on the subject of the settlement's fairness, reasonableness and adequacy. Certain objectors who, in later commenced suits, have asserted claims and issues in State Court, duplicative of those before this Court, appeared on the hearing herein and advanced objections directed principally against the sufficiency of the consideration of the settlement proposed and the alleged conflict of the settlement with rights of appraisal that the objectors allegedly could assert under New York's merger laws in State Court.

For the reasons appearing hereafter, the objections are overruled and the settlement as proposed will be approved in all respects as fair, reasonable and adequate and ordered to be consummated.

### Jurisdiction

This Court has jurisdiction over the Consolidated Amended and Supplemental Complaint under Section 44 of the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a–43 and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, as to the federal claims asserted; and under principles of pendent jurisdiction as to the state-law claims asserted.

### Background

Effective January 1, 1882, the Gold and Stock Telegraph Company ("G&S") leased to The Western Union Telegraph Company ("WUT") for a period of 99 years all of its telegraph lines and business "now owned, operated or controlled by 'G&S' . . . including franchises, easements, stocks in other Telegraph or Telephone Companies, inventions, patents, and patent rights, and interest in inventions and patents of every kind and nature whatsoever owned, used or enjoyed by G&S" . . . (The operating assets so transferred long ago outlived their usefulness and are no longer possessed, operated or suitable for use).

Under the lease, Western Union was granted "full right and authority to use, operate and enjoy the same . . . as fully as [G&S] might have done. . . ." All the earnings and revenues derived from the property of G&S were expressly reserved for WUT. In return WUT was obligated to pay during the entire term of the lease, $6

per year per share to G&S shareholders in quarterly installments (these have been paid except for the last quarter, 1980, mentioned below).

The lease, as indicated, expired on December 31, 1980. Long prior thereto, G&S became a non-operating "paper company"—having no operating assets, operating revenues or employees. The lease did not obligate Western Union, either expressly or by implication, to enhance, improve or develop the assets or business of Gold and Stock; nor did the lease express or contemplate any reversionary obligation payable by WUT to G&S on termination of the lease.

By 1980, WUT had acquired and owned 95.3% of the total outstanding capital stock of G&S (47,629 out of the total 50,000 shares). Both companies were incorporated in New York. Under Section 905 of the New York Business Corporation Law—the so-called "short-form merger" statute—WUT was entitled to and decided to effect a merger into WUT under Section 905 prior to the expiration of the lease. Under the law no action of the Board of Directors or stockholders of G&S was required. After an investigation by outside counsel in conjunction with WUT to uncover any assets unknown or other circumstances bearing on the value of the assets of G&S, the Board of Directors of WUT determined that the fair value per share payable in the merger for the 2,371 shares of G&S remaining outstanding was $256.97 per share. This was made up of three items: 1) plant and equipment transferred to WUT under the lease, which has been valued since 1943 at $423,-203.39, representing the aggregate amount at which such assets were listed and valued on the G&S inventory attached to the lease; 2) the net proceeds of $12,200,245.59, derived from the disposition by WUT of the stock assets of G&S, the last transaction having been made in 1953; and 3) the value of the stocks of G&S not disposed of, estimated since 1954 at $150,000. To the per share amount derived from these items, WUT added $1.50 per share representing the final, fourth quarter amount to be paid on account of the $6.00 per year payment due G&S shareholders under the lease.

The market price of G&S shares has apparently never traded in excess of $225 per share and this was also considered by WUT's Board of Directors.

The merger was duly effected. On October 15, 1980 WUT applied for the consent of the New York Public Service Commission with respect to the merger. Prior thereto, this suit had been commenced and plaintiffs, by their counsel herein, opposed the application, requesting a hearing thereon and raised objections to the merger, including claims related to G&S' reversionary interest under the lease. On December 30, 1980 the Commission granted WUT's petition. The merger became effective that same day upon the filing of the Certificate of Merger by the Secretary of State.

*The Prior Proceedings Herein*

This suit was commenced on July 3, 1980 by plaintiff TBK Partners, Ltd. as a class action. The complaint was asserted on behalf of G&S minority shareholders and alleged that G&S was and had been an investment company under the Federal Investment Company Act of 1940 without compliance with certain provisions thereof; and that the defendants had breached their fiduciary duties to the class under state law, in that the defendants allegedly, among other things, had wrongfully commingled G&S' assets transferred under the lease with the assets of WUT, and failed to maintain and report to G&S stockholders or to maintain adequate records reflecting separately the assets of G&S and dispositions thereof. The complaint requested, among other things, that WUT be enjoined "from entering into any merger or other business combination" involving G&S, and included extensive allegations and claims relating to WUT's obligations under the lease.

On October 24, 1980 the defendants mailed to G&S shareholders a notice of plan of merger and information statement. Within two weeks, plaintiff TBK requested temporary injunctive relief against the merger and an extension of the 20-day period under Section 623(c) of the New York Business Corporation Law during which

shareholders who elected to exercise appraisal rights were required to file notices of election to dissent. That request was denied by the Court. Plaintiff thereupon requested leave to assert additional claims relating directly to the merger and to WUT's alleged obligations to G&S upon expiration of the lease. In response the Court stated that no formal amended pleading would be required and that the additional claims could be set forth in plaintiff's proposed findings and conclusions which the Court directed be promptly prepared and served to facilitate an early trial. Preliminary injunctive relief was refused by the Court and an early trial date was indicated by the Court.

In connection with the continued preparation of the action for an early trial a form of Notice of Pendency of Class Action was prepared to be sent by TBK to the G&S minority shareholders under Rule 23 Fed.R. Civ.P. In this, TBK set forth its claims to be litigated in the action. The Notice of Pendency was approved as to form and on December 2, 1980 the action was certified as a class suit under Rules 23(a), 23(b)(1)(A), 23(b)(1)(B) and 23(b)(2). Plaintiff TBK was appointed as the class representative and its attorneys were appointed as class counsel. Just prior to those proceedings, on November 10, 1980, counsel for the objectors herein commenced an action in Supreme Court New York County, referred to hereafter as the *Spier* suit. The state court complaint was couched in the form of a class suit for the same G&S minority shareholders and the causes of action were also asserted derivatively on behalf of G&S. It alleged precisely the same claims already at issue in this Court, viz.: WUT's obligations upon expiration of the lease and the legality of the merger. The *Spier* complaint also prayed for the same relief as that sought in this Court: an injunction against the merger, an accounting for G&S' assets and property held by WUT during the 99 year lease term and a return of G&S' business, or the value thereof, to G&S or its shareholders.

Spier on November 10, 1980 had sought a temporary restraining order in state court and had moved for a preliminary injunction against the merger. However, a temporary restraining order against the merger was denied and his motion for a preliminary injunction was argued on November 12th; it was ultimately denied.

On December 3, 1980, the day following the certification of the federal suit as a class action, the *Spier* counsel at a conference with this Court requested certain changes in the proposed Notice of Pendency mentioned above. These were found to be acceptable and accordingly the form was modified by the Court, on consent, and it was mailed thereafter. *Spier* counsel did not object to the certification of the federal suit as a class action, nor do they now. At the same conference *Spier* counsel requested that they be appointed as co-lead counsel for the class herein. However, this request was rejected by the Court as unnecessary and uncalled for in the circumstances. *Spier* counsel then indicated that they might seek leave to intervene herein but they did not act to obtain such leave thereafter.

On December 15, 1980 WUT and the other defendants in the *Spier* action moved to dismiss or stay the state court suit under New York CPLR Rule 3211(a)(4) and Section 2201; the motion was based upon the prior pendency of this federal suit. The motion was opposed on various grounds including charges that the proceedings in this federal suit had been "postured" by WUT and were the result of some sort of "collaboration". WUT's motion to stay the *Spier* action based on the prior pendency of this federal suit was granted by the state court on April 28, 1981. The state court held that the federal action raised "all the state law claims made by plaintiffs" and that a disposition of this federal suit would preclude further litigation of the *Spier* action and that the "argument that they [Spier] have an unconditional right to conduct their class litigation precisely and only in the manner they decide, is unfounded in law".

On December 30, 1980, another G&S stockholder, plaintiff Julius Garfield herein, commenced a derivative suit in the right of G&S in this Court. Garfield's complaint

alleged that G&S and its directors had not taken any steps to protect G&S' reversionary interest in its business, properties and other assets leased to WUT, that WUT had violated the lease and its fiduciary obligations owing to G&S; and that the merger was illegal and fraudulent, and without a proper business purpose. Garfield's complaint also alleged that G&S' reversionary interest exceeded WUT's historical valuation thereof by at least four times that amount.

On March 11, 1981 five of the present objectors (again by their present counsel) commenced a second state court suit in the form of an appraisal proceeding also denominated a *Spier*, et al, suit. This appraisal proceeding was purportedly commenced under Section 623 of the Business Corporation Law seeking a judicial determination of the "fair value" of the G&S shares held by the dissenting objectors.

The appraisal proceeding is based on the identical claims raised in the initial *Spier* action and in this suit before this Court. It is based entirely upon allegations concerning WUT's supposed reversionary obligation to G&S upon expiration of the lease— claims which are fundamental to both *Spier* and to this action. A comparison of the petition in the appraisal proceeding and the claims asserted in this Court establishes that the claims asserted in the appraisal proceeding, just as those in *Spier*, are actually duplicative of those raised in this federal action.

On March 19, 1981 WUT moved in state court to stay or dismiss the objectors' appraisal proceeding. WUT's motion was granted; the state court dismissed the appraisal proceeding on May 6, 1981 holding that, in view of the earlier decision staying the *Spier* action in favor of this federal action, any issues as to the appraisal of the value of G&S shares should be resolved in the action before this Court. An appeal was noticed from that dismissal which apparently remains still pending.

By order dated April 3, 1981, upon consent of the parties the TBK and Garfield actions herein were consolidated and a Con-

solidated Amended and Supplemental Complaint was thereupon filed herein which named both plaintiffs and recited all of the claims previously asserted by both of them herein.

Prior to the filing of the *Garfield* suit preliminary settlement talks had taken place between counsel for TBK and the defendants. With the filing of the *Garfield* action, those discussions were held in abeyance to give Garfield's attorney an opportunity to fully familiarize himself with the scope of documentary discovery already afforded in the TBK suit. Then, on March 12, 1981, WUT made its Executive Vice President available for deposition by both firms of plaintiffs' counsel. The deposition confirmed the thorough nature of the investigation conducted at WUT's behest in preparation for the merger.

*The Proposed Settlement*

Settlement discussions in this action were pursued actively from December 1980 through March 1981, commencing at a stage in this litigation when the parties were preparing for an early trial under the Court's direction and while the plaintiffs were afforded the benefit of voluminous documentary discovery (as well as their own independent investigation) on the historical and current relations between G&S and WUT. With the advent of the *Garfield* suit, counsel were given a further opportunity to investigate the situation and to conduct further research into the documents produced by WUT in the document depositary. The document depositary referred to was a collection of material made available to G&S shareholders or their representatives (including counsel for the plaintiffs herein and for the objectors), for their direct inspection, containing thousands of pertinent documents and records relating to G&S that had been collated and referred to in the course of the investigation of the background of the lease agreement. Negotiations for a settlement resumed subsequently and an understanding was reached and reported to the Court.

The settlement provides for an increase in the total reversionary interest ascribed to

G&S of over $6-million which, translated into the remaining outstanding 4.7% public interest in the G&S shares, represents a benefit to the minority class group in the form of a $300,000 settlement fund. The settlement fund will enable members of the class to receive an additional minimum payment of $126.53 per G&S share (before possible deduction of certain attorneys' fees) over and above the proferred $256.97 merger price. As an additional benefit, the settlement provides for WUT to pay $30,000 over and above the settlement fund for attorneys' fees and expenses if awarded by the Court. The settlement is a global disposition which would put to rest all of the duplicative and overlapping claims being asserted in this Court and in the state court proceedings.

There is no question in the Court's mind that the proposed settlement before this Court is the product of arm's length, hard fought, negotiations among experienced, adversary counsel. The Court had before it in pretrial proceedings the various counsel and was made a party to the rival contentions by both sides. The Court was able to learn at first hand of the stubborn resistance on the part of plaintiffs' counsel to any suggestion that would bring about a disposition of this suit without an increase in the benefits evaluated by WUT in connection with the merger proposals. The physical evidence indicates quite clearly that prior to negotiating the settlement, plaintiffs' counsel herein had undertaken a thorough investigation of all aspects of this litigation. In the course of the settlement negotiations as reported to the Court and from the Court's own estimate of the reports it was clear that WUT from the outset was unwilling to consider any settlement other than a global settlement which would finally put an end to all controversy on the subject matters of the litigations. WUT made it clear that it had no intention of paying a substantial sum to the class and then find itself litigating the same claims and issues settled herein in the pending state court actions.

Accordingly, the proposed settlement, in addition to providing for the monetary consideration mentioned, contains provisions for a release by the plaintiffs, the class and the members of the class of all claims relating to the settled claims, effective upon approval of the settlement by the Court; and an injunction against the commencement or prosecution of actions by any class members against defendants asserting any of the settled claims. Jurisdiction is reserved over the effectuation of the settlement in this Court. The distribution of the settlement fund to the class members would follow final approval if given to the settlement and the dismissal, with prejudice, of the *Spier* actions including the appraisal proceeding, based on the settlement, and without liability on the part of any defendant.

*The Objections to the Settlement*

1. The objectors contend that the value of each share of G&S is $17,000 as compared with the amount of $256.97 to be paid pursuant to the merger. This claim is posited on an alleged obligation on the part of WUT to return a "business" to G&S at the expiration of the lease. The business is asserted to be what evolved from the 1881 business of G&S including the enhancements and improvements which occurred over the years since then. Moreover this purported $17,000 a share value is based on the book value by WUT itself of WUT's private communications business today. In short, it is the position of the objectors, in effect, that WUT of today is the G&S of 1881 and that the G&S shareholders—not the WUT shareholders—"own" WUT.

■ There is no provision in the lease which required WUT to enhance, improve or develop G&S' assets or business over the course of the term of the lease. To find such a requirement would require rewriting of the lease. WUT has referred over the years in its reports and otherwise to the return of the non-stock assets of G&S. However, such statements acknowledge no more than that a reversion exists. The amount of G&S' operating assets were valued at the time of the lease—$423,230.39 inventory figure mentioned above—which

has been fully recompensed in the merger price itself notwithstanding that no such assets remain in existence. The objectors do not dispute that in fact those 1881 physical assets were consumable, disused and superseded and that there were no G&S operating assets on hand at the time of the merger and the expiration of the lease; the 1881 circumstances having gone into oblivion.

WUT has pointed out that only $191,533. of G&S' 1881 profits were derived from the lines of business which the objectors claim it is entitled to receive back from WUT—this being an amount which is about three and one-half percent of WUT's net profits for the same period prior to the lease.

The objectors further contend that decisions of the New York Court of Appeals support their view that a functioning business was to be returned to G&S at the expiration of the lease. *Johnson v. Western Union Telegraph Co.*, No. 30748–1942, (Sup. Ct.N.Y.Co. Mar. 17, 1943), *aff'd.* without opinion, 267 App.Div. 757, 45 N.Y.S.2d 957 (1st Dept. 1943), *rev'd on other grounds; aff'd as to no duty to segregate*, 293 N.Y. 379, 57 N.E.2d 721 (1944), *on remand*, 184 Misc. 728, 53 N.Y.S.2d 867 (Sup.Ct.N.Y.Co. 1945). However, the objectors have wrenched the language which they point to from its context in the Court of Appeals decision. That decision treated the question whether WUT was obligated under the lease to pay the federal income taxes being assessed against G&S on the rental payments, (293 N.Y. at 382), not the reversionary interest of G&S. In *Gold & Stock Telegraph Co. v. Commissioner of Internal Revenue*, 83 F.2d 465 (2d Cir.), *cert. denied*, 299 U.S. 564, 57 S.Ct. 26, 81 L.Ed. 415 (1936) it had been held that the rental payments under the lease, although paid by WUT directly to the G&S shareholders, constituted "income" to G&S itself, and were therefore taxable at the corporate level as well as to the shareholders upon receipt. It was in this context alone that the Court of Appeals in New York referred to the provision in the lease requiring WUT to keep G&S' properties free of "encumbrance" and by extension, tax liens. That reference was relevant only to the question of G&S' getting its 1881 property back "intact"—not enhanced with or tacked on with developments of 99 years of technological advancement, as objectors contend.

Moreover, it has been pointed out by WUT that the record herein establishes that WUT's private communication services of today were first introduced around the beginning of World War II with the advent of the computer age and WUT's business cannot be said to resemble G&S' pre-1881 business. As described in WUT's 1950 annual report, WUT installed the first major private wire system in 1939. There is nothing in the record to support the position that any part of WUT's present lines of business were derived, directly or indirectly, from G&S.

Objectors make the further argument that an 1871 agreement between WUT and G&S precluded WUT from being in the private telegraph business. That agreement was expressly for a term of 25 years which expired before the turn of the century. Moreover the agreement only provided for G&S' operation of those types of private lines specially related to G&S' market reporting operations, not all private wire services. Incidently, the lease between WUT and G&S itself expressly provides for the annulment of the 1871 agreement.

Even taking the most extreme of objectors' $17,000 per share claims, that there was a reversionary obligation to return a "business" to G&S, the value of each G&S share cannot be "calculated" based upon WUT's 1980 "book value".

2. The objectors contend that the number of those objecting to settlement precludes an approval of a proposed settlement for the class. Objectors' counsel mentioned that they represent ten G&S shareholders holding 1,299 G&S shares out of the total of 2,371 shares outstanding publicly. In fact, there are 71 holders of record of the 2,371 shares. Undoubtedly, the proportion of a class opposed to a settlement is one factor to be considered in assessing its fairness. However, a settlement is not unfair

or unreasonable simply because a large number of class members, or the holders of a large number of shares, oppose it. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). *See also, Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *Stull v. Baker*, 410 F.Supp. 1326, 1333 (S.D.N.Y.1976); *American Basketball Ass'n. Players v. National Basketball Ass'n.*, 72 F.R.D. 594, 598 (S.D.N.Y.1976).

■ 3. The objectors contend that the Court's power to approve the settlement is precluded by the fact that claims asserted in a state court appraisal proceeding might thereby become valueless. It is horn-book law that a judgment in a federal action properly bars not only those issues relating to the matters in question which are raised in the action, but also those which could have been raised. This applies to other actions arising out of the same subject matter, even if initiated by different shareholders and even if in state court. There is no legal reason to treat an appraisal proceeding as standing on any different footing. If the issues are common they are subject to the universal rule of the binding effect of a judgment.

■ The objectors cite New York Business Corporation Law Section 623(h)(3) which confers on the Supreme Court for the judicial district wherein the corporation's offices are located "exclusive" jurisdiction over appraisal proceedings. That is no more, however, than a venue provision designed to put an appraisal proceeding in one and only one judicial district per each company—and does not purport to be a grant of "exclusive" state-court jurisdiction in the sense contended for by the objectors. *See Application of Harwitz*, 192 Misc. 91, 92, 80 N.Y.S.2d 570, 572; (Sup.Ct. Bronx Co. 1948) (predecessor of § 623(h) construed as venue provision); *Cf. Alkire v. Interstate Theatres Corp.*, 379 F.Supp. 1210, 1213 & n.7 (D.Mass. 1974). A state-created claim, as a general matter "cannot be withdrawn from the cognizance of such Federal Court by any provision of state legislation that it shall only be enforced in a State Court". *Railway Co. v.*

*Witton's Administrator*, 80 U.S. (13 Wall) 270, 285, 20 L.Ed. 571 (1872). Federal decisions have held that the federal courts have the power to entertain proceedings for appraisal created by state appraisal statutes. In *Poe v. Marquette Cement Mfg. Corp.*, 376 F.Supp. 1054 (D.Md.1974), the Court sitting in diversity, held that it had jurisdiction over an appraisal cause of action conferred by state law. This Circuit has likewise held that federal courts may exercise jurisdiction over state-law claims by dissenting shareholders seeking the same "fair value" as available in a state-court appraisal. *See Weiss v. Routh*, 149 F.2d 193, 195 (2d Cir. 1945); *LeWald v. York Corp.*, 68 F.Supp. 386 (S.D.N.Y.1946); *Shore v. Park Lane Hosiery Co., Inc.*, 74 Civ. 4986 (CSH) (S.D.N.Y. Aug. 1, 1980). Parenthetically, as the Second Circuit has stated, even when a Court does not have the power to adjudicate a claim, it may still "approve the release of that claim as a condition of settlement of the [action before it]". *Abramson v. Penwood Investment Corp.*, 392 F.2d 759, 762 (2d Cir. 1968).

■ 4. The objectors next raise the point that diversity jurisdiction between plaintiff Garfield and WUT or G&S was absent and that this lack renders the original complaint in *Garfield* jurisdictionally deficient. According to the objectors this point precludes an adjudication of the matters contained in the Amended Consolidated and Supplemental Complaint filed pursuant to the Court's April 3, 1981 order. That complaint includes the derivative claims posited, not on the basis of diversity jurisdiction of citizenship, but as pendent claims to the *federal claims* being asserted *by both named plaintiffs*—TBK and Garfield. The presence or absence of diversity as between Garfield and anyone else is wholly irrelevant. It is settled law that "Once an amended pleading is interposed, the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading". 6 Wright & Miller, Federal Practice and Procedure ¶ 1476, at 389–90 (1971).

5. Objectors next turn to presumably applicable principles of fiduciary duty law which they argue are relevant to impose on WUT a reversionary obligation to G&S to enhance and develop the business of G&S, to take advantage of business opportunities in favor of G&S and to be in a position to return to G&S at the expiration of the term of the lease the resulting business. In short terms, there is no such principle of law imposing such an obligation on a tenant to a landlord. In any case, the strained and inappropriate arguments from the law of fiduciaries have been evaluated by the Court and do not present an obstacle to settlement or impair the value of the consideration.

6. The other objections made and implicit in the presentation of objectors' counsel have each been considered and found wanting in merit. There is no doubt that the negotiations leading to the proposed settlement were at arm's length and that sufficient discovery has been had to warrant reaching a conclusion terminating this suit on a fair, reasonable and adequate settlement.

*Standards for Approval of a Settlement*

The standards for Court approval of settlements are well established and have been repeatedly quoted and cited in prior decisions of this Court. *See Republic National Life Insurance Co. v. Beasley*, 73 F.R.D. 658, 667–68 (S.D.N.Y.1977); *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y. 1972); *Zerkle v. Cleveland Cliffs & Co.*, 52 F.R.D. 151, 159 (S.D.N.Y.1971).

The defendants correctly point out that this case presents precisely the kind of circumstances described in the *Zerkle* opinion: a case in which "the optimistic forecast" and "large demands" asserted by objectors should be given little weight by the Court in determining whether to approve the settlement of an "unpredictable" litigation.

In deciding whether to approve a settlement which proposes to conclude claims asserted in pending state-court actions, such as the one before the Court "[a] federal court should determine for itself whether it has that power and may properly exercise it—not pass over the question because a state court may assume the unenviable task of deciding that its act was a nullity"; the Court "must assume that [the state courts] will interpret the settlement to mean what it says". *National Super Spuds, Inc. v. New York Mercantile Exchange,* ——— F.2d ———, Docket No. 80–7760 (2d Cir. May 13, 1981) ———, ———.

If this case is not settled it is likely (indeed certain) that complex, costly and protracted litigation would result; this is plainly a case in which the class bears an extremely high risk that such complex, costly and protracted litigation will fail to result in any recovery; and in view of the sizable risks of litigation, the proposed settlement fund properly falls within the range of reasonableness. The further prosecution of this action, or of the state court proceedings, would entail for class members severe problems of proof dependent upon ancient document and historical accounts covering at least 99 years of history, thereby raising serious questions as to authenticity, completeness and admissibility.

As an additional benefit to the public stockholders of G&S, Western Union will add $30,000 to the settlement fund as a contribution toward attorneys fees and expenses to be awarded by the Court. Added to these benefits aggregating $330,000, to the extent that WUT has agreed to assume all of the expenses of printed notices to the class, advertising in financial media pursuant to the Court's direction, and expenses of administration, is a further benefit the value of which could approximate as much as $10,000. It appears, therefore, that the settlement benefits are of approximately $340,000.

The $300,000 fund is presently held by plaintiffs' counsel in an interest-bearing escrow account pending finality of the settlement, accruing interest at the annual rate of over 13%. Based on prevailing interest rates, it appears that approximately $3,300 per month, or $20,000 of interest may accrue during the period estimated to wind up the cases. This could be another $40,000 increase in the fund equal to approximately $8.40 per share for each of the 2,371 shares

comprising the minority interest and available for payment of fees payable herein for the benefit of the class.

■ In sum, the proponents of the settlement have clearly met their burden of showing the settlement to be fair, reasonable and adequate, negotiated at arm's length, and reached in good faith and in the considered judgment of those fully aware of the factors and the strengths and weaknesses in the litigation and the matters involved.

In connection with their request for an allowance for counsel fees (to also include expenses), plaintiffs' counsel have dealt in their joint petition with all of the criteria for fee awards outlined in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) [Grinnell I] and the subsequent decision of the Second Circuit, 560 F.2d 1093 (2d Cir. 1977) [Grinnell II], including a detailed breakdown of time expended by the partners and associates of the Lowey and Nemser firms from inception of the litigation to and including April 30, 1980.

The summary of time annexed as Schedule B to the petition shows a total of 1,180.1 hours of attorneys' time, while expenses of $4,462.25 to that date are reflected in Schedule A to the petition. The summaries apparently do not include time necessarily required in connection with preparation and attendance at the settlement hearing; in responding to post-hearing correspondence initiated by the objectors, and future time to be spent in the final mechanics of settlement and distribution of the settlement fund, all of which will entail a further expenditure of time and attention which counsel estimate to be 50 to 75 hours, as well as additional disbursements to be incurred. Over one-half of the time spent heretofore—593.2 hours—was expended by senior attorneys alone.

■ Taking into account all relevant factors, the Court awards to plaintiffs' attorneys the total amount of $70,000.00, as fees and expenses payable to them, to consist of the $30,000 contribution to be paid by WUT, plus the further sum of $40,000, to be paid and deducted pro rata from the gross amount of the remaining $300,000 settle-

ment fund as augmented by the interest accrued thereon as of the date of liquidation of the escrow account, payable to class members under the settlement stipulation. This award is determined to be a fair and reasonable allowance to counsel after taking appropriate account of the nature of the claims, the difficulties and the contingency risks involved in the litigation, benefits achieved for the class, legal services necessarily supplied and all other relevant factors. The proposed allocation suggested by plaintiffs' counsel (85% to the Lowey firm and 15% to the Nemser firm) of the award, after deducting expenses, appears to be a fair and reasonable estimate of the respective services supplied and responsibilities assumed and is hereby approved.

Although no application therefor was filed, no award will be made from the fund to counsel for the objectors for attorneys' fees or expenses.

The settlement is approved. Submit judgment accordingly.

The Court will retain jurisdiction for the enforcement and satisfaction of the judgment to be entered.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) Fed.R.Civ.P.

SO ORDERED.